## WEST VIRGINIA STATE BOARD OF EDUCATION ET AL. *v.* BARNETTE ET AL.

No. 591. Argued March 11, 1943.—Decided June 14, 1943.

*Mr. W. Holt Wooddell,* Assistant Attorney General of West Virginia, with whom *Mr. Ira J. Partlow* was on the brief, for appellants.

*Mr. Hayden C. Covington* for appellees.

Briefs of *amici curiae* were filed on behalf of the Committee on the Bill of Rights, of the American Bar Association, consisting of *Messrs. Douglas Arant, Julius Birge, William D. Campbell, Zechariah Chafee, Jr., L. Stanley Ford, Abe Fortas, George I. Haight, H. Austin Hauxhurst, Monte M. Lemann, Alvin Richards, Earl F. Morris, Burton W. Musser,* and *Basil O'Connor;* and by *Messrs. Osmond K. Fraenkel, Arthur Garfield Hays,* and *Howard B. Lee,* on behalf of the American Civil Liberties Union,—urging affirmance; and by *Mr. Ralph B. Gregg,* on behalf of the American Legion, urging reversal.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Following the decision by this Court on June 3, 1940, in *Minersville School District* v. *Gobitis,* 310 U. S. 586, the West Virginia legislature amended its statutes to require all schools therein to conduct courses of instruction in history, civics, and in the Constitutions of the United States and of the State "for the purpose of teaching, fostering and perpetuating the ideals, principles and spirit of Americanism, and increasing the knowledge of the organization and machinery of the government."   Appel-

lant Board of Education was directed, with advice of the State Superintendent of Schools, to "prescribe the courses of study covering these subjects" for public schools. The Act made it the duty of private, parochial and denominational schools to prescribe courses of study "similar to those required for the public schools."[1]

The Board of Education on January 9, 1942, adopted a resolution containing recitals taken largely from the Court's *Gobitis* opinion and ordering that the salute to the flag become "a regular part of the program of activities in the public schools," that all teachers and pupils "shall be required to participate in the salute honoring the Nation represented by the Flag; provided, however, that refusal to salute the Flag be regarded as an act of insubordination, and shall be dealt with accordingly."[2]

[1] § 1734, West Virginia Code (1941 Supp.):

"In all public, private, parochial and denominational schools located within this state there shall be given regular courses of instruction in history of the United States, in civics, and in the constitutions of the United States and of the State of West Virginia, for the purpose of teaching, fostering and perpetuating the ideals, principles and spirit of Americanism, and increasing the knowledge of the organization and machinery of the government of the United States and of the state of West Virginia. The state board of education shall, with the advice of the state superintendent of schools, prescribe the courses of study covering these subjects for the public elementary and grammar schools, public high schools and state normal schools. It shall be the duty of the officials or boards having authority over the respective private, parochial and denominational schools to prescribe courses of study for the schools under their control and supervision similar to those required for the public schools."

[2] The text is as follows:

"WHEREAS, The West Virginia State Board of Education holds in highest regard those rights and privileges guaranteed by the Bill of Rights in the Constitution of the United States of America and in the Constitution of West Virginia, specifically, the first amendment to the Constitution of the United States as restated in the fourteenth amend-

The resolution originally required the "commonly accepted salute to the Flag" which it defined. Objections to the salute as "being too much like Hitler's" were raised by the Parent and Teachers Association, the Boy and Girl

ment to the same document and in the guarantee of religious freedom in Article III of the Constitution of this State, and

"Whereas, The West Virginia State Board of Education honors the broad principle that one's convictions about the ultimate mystery of the universe and man's relation to it is placed beyond the reach of law; that the propagation of belief is protected whether in church or chapel, mosque or synagogue, tabernacle or meeting house; that the Constitutions of the United States and of the State of West Virginia assure generous immunity to the individual from imposition of penalty for offending, in the course of his own religious activities, the religious views of others, be they a minority or those who are dominant in the government, but

"Whereas, The West Virginia State Board of Education recognizes that the manifold character of man's relations may bring his conception of religious duty into conflict with the secular interests of his fellowman; that conscientious scruples have not in the course of the long struggle for religious toleration relieved the individual from obedience to the general law not aimed at the promotion or restriction of the religious beliefs; that the mere possession of convictions which contradict the relevant concerns of political society does not relieve the citizen from the discharge of political responsibility, and

"Whereas, The West Virginia State Board of Education holds that national unity is the basis of national security; that the flag of our Nation is the symbol of our National Unity transcending all internal differences, however large within the framework of the Constitution; that the Flag is the symbol of the Nation's power; that emblem of freedom in its truest, best sense; that it signifies government resting on the consent of the governed, liberty regulated by law, protection of the weak against the strong, security against the exercise of arbitrary power, and absolute safety for free institutions against foreign aggression, and

"Whereas, The West Virginia State Board of Education maintains that the public schools, established by the legislature of the State of West Virginia under the authority of the Constitution of the State of West Virginia and supported by taxes imposed by legally constituted measures, are dealing with the formative period in the development

Scouts, the Red Cross, and the Federation of Women's Clubs.[3] Some modification appears to have been made in deference to these objections, but no concession was made to Jehovah's Witnesses.[4] What is now required is the "stiff-arm" salute, the saluter to keep the right hand raised with palm turned up while the following is repeated: "I pledge allegiance to the Flag of the United States of

in citizenship that the Flag is an allowable portion of the program of schools thus publicly supported.

"Therefore, be it RESOLVED, That the West Virginia Board of Education does hereby recognize and order that the commonly accepted salute to the Flag of the United States—the right hand is placed upon the breast and the following pledge repeated in unison: 'I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands; one Nation, indivisible, with liberty and justice for all'—now becomes a regular part of the program of activities in the public schools, supported in whole or in part by public funds, and that all teachers as defined by law in West Virginia and pupils in such schools shall be required to participate in the salute, honoring the Nation represented by the Flag; provided, however, that refusal to salute the Flag be regarded as an act of insubordination, and shall be dealt with accordingly."

[3] The National Headquarters of the United States Flag Association takes the position that the extension of the right arm in this salute to the flag is not the Nazi-Fascist salute, "although quite similar to it. In the Pledge to the Flag the right arm is extended and raised, palm UPWARD, whereas the Nazis extend the arm practically *straight to the front* (the finger tips being about even with the eyes), *palm DOWNWARD*, and the Fascists do the same except they raise the arm slightly higher." James A. Moss, The Flag of the United States: Its History and Symbolism (1914) 108.

[4] They have offered in lieu of participating in the flag salute ceremony "periodically and publicly" to give the following pledge:

"I have pledged my unqualified allegiance and devotion to Jehovah, the Almighty God, and to His Kingdom, for which Jesus commands all Christians to pray.

"I respect the flag of the United States and acknowledge it as a symbol of freedom and justice to all.

"I pledge allegiance and obedience to all the laws of the United States that are consistent with God's law, as set forth in the Bible."

America and to the Republic for which it stands; one Nation, indivisible, with liberty and justice for all."

Failure to conform is "insubordination" dealt with by expulsion. Readmission is denied by statute until compliance. Meanwhile the expelled child is "unlawfully absent"[5] and may be proceeded against as a delinquent.[6] His parents or guardians are liable to prosecution,[7] and if convicted are subject to fine not exceeding $50 and jail term not exceeding thirty days.[8]

Appellees, citizens of the United States and of West Virginia, brought suit in the United States District Court for themselves and others similarly situated asking its injunction to restrain enforcement of these laws and regulations against Jehovah's Witnesses. The Witnesses are an unincorporated body teaching that the obligation imposed by law of God is superior to that of laws enacted by temporal government. Their religious beliefs include a literal version of Exodus, Chapter 20, verses 4 and 5, which says: "Thou shalt not make unto thee any graven image, or any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth; thou shalt not bow down thyself to them nor serve them." They consider that the flag is an "image" within this command. For this reason they refuse to salute it.

---

[5] § 1851 (1), West Virginia Code (1941 Supp.):

"If a child be dismissed, suspended, or expelled from school because of refusal of such child to meet the legal and lawful requirements of the school and the established regulations of the county and/or state board of education, further admission of the child to school shall be refused until such requirements and regulations be complied with. Any such child shall be treated as being unlawfully absent from school during the time he refuses to comply with such requirements and regulations, and any person having legal or actual control of such child shall be liable to prosecution under the provisions of this article for the absence of such child from school."

[6] § 4904 (4), West Virginia Code (1941 Supp.).

[7] See Note 5, *supra*.

[8] §§ 1847, 1851, West Virginia Code (1941 Supp.).

Children of this faith have been expelled from school and are threatened with exclusion for no other cause. Officials threaten to send them to reformatories maintained for criminally inclined juveniles. Parents of such children have been prosecuted and are threatened with prosecutions for causing delinquency.

The Board of Education moved to dismiss the complaint setting forth these facts and alleging that the law and regulations are an unconstitutional denial of religious freedom, and of freedom of speech, and are invalid under the "due process" and "equal protection" clauses of the Fourteenth Amendment to the Federal Constitution. The cause was submitted on the pleadings to a District Court of three judges. It restrained enforcement as to the plaintiffs and those of that class. The Board of Education brought the case here by direct appeal.[9]

This case calls upon us to reconsider a precedent decision, as the Court throughout its history often has been required to do.[10] Before turning to the *Gobitis* case, however, it is desirable to notice certain characteristics by which this controversy is distinguished.

The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin. But the refusal of these persons to participate in the ceremony does not interfere with or deny rights of others to do so. Nor is there any question in this case that their behavior is peaceable and orderly. The sole conflict is between authority and rights of the individual. The State asserts power to condition access to public education on making a prescribed sign and profession and at the same time to coerce

[9] § 266 of the Judicial Code, 28 U. S. C. § 380.

[10] See authorities cited in *Helvering* v. *Griffiths*, 318 U. S. 371, 401, note 52.

attendance by punishing both parent and child. The latter stand on a right of self-determination in matters that touch individual opinion and personal attitude.

As the present CHIEF JUSTICE said in dissent in the *Gobitis* case, the State may "require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty, which tend to inspire patriotism and love of country." 310 U. S. at 604. Here, however, we are dealing with a compulsion of students to declare a belief. They are not merely made acquainted with the flag salute so that they may be informed as to what it is or even what it means. The issue here is whether this slow and easily neglected [11] route to aroused loyalties constitutionally may be short-cut by substituting a compulsory salute and slogan.[12] This issue is not prejudiced by

[11] See the nation-wide survey of the study of American history conducted by the New York Times, the results of which are published in the issue of June 21, 1942, and are there summarized on p. 1, col. 1, as follows:

"82 per cent of the institutions of higher learning in the United States do not require the study of United States history for the undergraduate degree. Eighteen per cent of the colleges and universities require such history courses before a degree is awarded. It was found that many students complete their four years in college without taking any history courses dealing with this country.

"Seventy-two per cent of the colleges and universities do not require United States history for admission, while 28 per cent require it. As a result, the survey revealed, many students go through high school, college and then to the professional or graduate institution without having explored courses in the history of their country.

"Less than 10 per cent of the total undergraduate body was enrolled in United States history classes during the Spring semester just ended. Only 8 per cent of the freshman class took courses in United States history, although 30 per cent was enrolled in European or world history courses."

[12] The Resolution of the Board of Education did not adopt the flag salute because it was claimed to have educational value. It seems to have been concerned with promotion of national unity (see footnote

the Court's previous holding that where a State, without compelling attendance, extends college facilities to pupils who voluntarily enroll, it may prescribe military training as part of the course without offense to the Constitution. It was held that those who take advantage of its opportunities may not on ground of conscience refuse compliance with such conditions. *Hamilton* v. *Regents,* 293 U. S. 245. In the present case attendance is not optional. That case is also to be distinguished from the present one because, independently of college privileges or requirements, the State has power to raise militia and impose the duties of service therein upon its citizens.

There is no doubt that, in connection with the pledges, the flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee. A person gets from a

2), which justification is considered later in this opinion. No information as to its educational aspect is called to our attention except Olander, Children's Knowledge of the Flag Salute, 35 Journal of Educational Research 300, 305, which sets forth a study of the ability of a large and representative number of children to remember and state the meaning of the flag salute which they recited each day in school. His conclusion was that it revealed "a rather pathetic picture of our attempts to teach children not only the words but the meaning of our Flag Salute."

symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.

Over a decade ago Chief Justice Hughes led this Court in holding that the display of a red flag as a symbol of opposition by peaceful and legal means to organized government was protected by the free speech guaranties of the Constitution. *Stromberg* v. *California,* 283 U. S. 359. Here it is the State that employs a flag as a symbol of adherence to government as presently organized. It requires the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks. Objection to this form of communication when coerced is an old one, well known to the framers of the Bill of Rights.[18]

It is also to be noted that the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind. It is not clear whether the regulation contemplates that pupils forego any contrary convictions of their own and become unwilling converts to the prescribed ceremony or whether it will be acceptable if they simulate assent by words without belief and by a gesture barren of meaning. It is now a commonplace that censorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a kind the State is empowered to prevent and punish. It would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence. But here the power of com-

---

[18] Early Christians were frequently persecuted for their refusal to participate in ceremonies before the statue of the emperor or other symbol of imperial authority. The story of William Tell's sentence to shoot an apple off his son's head for refusal to salute a bailiff's hat is an ancient one. 21 Encyclopedia Britannica (14th ed.) 911–912. The Quakers, William Penn included, suffered punishment rather than uncover their heads in deference to any civil authority. Braithwaite, The Beginnings of Quakerism (1912) 200, 229–230, 232–233, 447, 451; Fox, Quakers Courageous (1941) 113.

pulsion is invoked without any allegation that remaining passive during a flag salute ritual creates a clear and present danger that would justify an effort even to muffle expression. To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind.

Whether the First Amendment to the Constitution will permit officials to order observance of ritual of this nature does not depend upon whether as a voluntary exercise we would think it to be good, bad or merely innocuous. Any credo of nationalism is likely to include what some disapprove or to omit what others think essential, and to give off different overtones as it takes on different accents or interpretations.[14] If official power exists to coerce acceptance of any patriotic creed, what it shall contain cannot be decided by courts, but must be largely discretionary with the ordaining authority, whose power to prescribe would no doubt include power to amend. Hence validity of the asserted power to force an American citizen publicly to profess any statement of belief or to engage in any ceremony of assent to one, presents questions of power that must be considered independently of any idea we may have as to the utility of the ceremony in question.

Nor does the issue as we see it turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views

---

[14] For example: Use of "Republic," if rendered to distinguish our government from a "democracy," or the words "one Nation," if intended to distinguish it from a "federation," open up old and bitter controversies in our political history; "liberty and justice for all," if it must be accepted as descriptive of the present order rather than an ideal, might to some seem an overstatement.

hold such a compulsory rite to infringe constitutional liberty of the individual.[15]  It is not necessary to inquire whether non-conformist beliefs will exempt from the duty to salute unless we first find power to make the salute a legal duty.

The *Gobitis* decision, however, *assumed*, as did the argument in that case and in this, that power exists in the State to impose the flag salute discipline upon school children in general.  The Court only examined and rejected a claim based on religious beliefs of immunity from an unquestioned general rule.[16]  The question which underlies the

[15] Cushman, Constitutional Law in 1939–40, 35 American Political Science Review 250, 271, observes: "All of the eloquence by which the majority extol the ceremony of flag saluting as a free expression of patriotism turns sour when used to describe the brutal compulsion which requires a sensitive and conscientious child to stultify himself in public."  For further criticism of the opinion in the *Gobitis* case by persons who do not share the faith of the Witnesses see: Powell, Conscience and the Constitution, in Democracy and National Unity (University of Chicago Press, 1941) 1; Wilkinson, Some Aspects of the Constitutional Guarantees of Civil Liberty, 11 Fordham Law Review 50; Fennell, The "Reconstructed Court" and Religious Freedom: The Gobitis Case in Retrospect, 19 New York University Law Quarterly Review 31; Green, Liberty under the Fourteenth Amendment, 27 Washington University Law Quarterly 497; 9 International Juridical Association Bulletin 1; 39 Michigan Law Review 149; 15 St. John's Law Review 95.

[16] The opinion says "That the flag-salute is an allowable portion of a school program *for those who do not invoke conscientious scruples* is *surely not debatable*.  But for us to insist that, *though the ceremony may be required, exceptional immunity must be given to dissidents*, is to maintain that there is no basis for a legislative judgment that such an exemption might introduce elements of difficulty into the school discipline, might cast doubts in the minds of the other children which would themselves weaken the effect of the exercise."  (Italics ours.)  310 U. S. at 599–600.  And elsewhere the question under consideration was stated, "When does the constitutional guarantee *compel exemption* from doing what society thinks necessary for the promotion of some great common end, or from a penalty for conduct which appears dangerous to the general good?"  (Italics ours.)  *Id.* at 593.  And again, ". . .

flag salute controversy is whether such a ceremony so touching matters of opinion and political attitude may be imposed upon the individual by official authority under powers committed to any political organization under our Constitution.   We examine rather than assume existence of this power and, against this broader definition of issues in this case, reëxamine specific grounds assigned for the *Gobitis* decision.

1.  It was said that the flag-salute controversy confronted the Court with "the problem which Lincoln cast in memorable dilemma: 'Must a government of necessity be too *strong* for the liberties of its people, or too *weak* to maintain its own existence?' " and that the answer must be in favor of strength.   *Minersville School District* v. *Gobitis, supra,* at 596.

We think these issues may be examined free of pressure or restraint growing out of such considerations.

It may be doubted whether Mr. Lincoln would have thought that the strength of government to maintain itself would be impressively vindicated by our confirming power of the State to expel a handful of children from school.   Such oversimplification, so handy in political debate, often lacks the precision necessary to postulates of judicial reasoning.   If validly applied to this problem, the utterance cited would resolve every issue of power in favor of those in authority and would require us to override every liberty thought to weaken or delay execution of their policies.

Government of limited power need not be anemic government.   Assurance that rights are secure tends to diminish fear and jealousy of strong government, and by making us feel safe to live under it makes for its better support.   Without promise of a limiting Bill of Rights it is

---

whether school children, like the Gobitis children, must be *excused from conduct required of all the other children* in the promotion of national cohesion. . . ." (Italics ours.)  *Id.* at 595.

doubtful if our Constitution could have mustered enough strength to enable its ratification. To enforce those rights today is not to choose weak government over strong government. It is only to adhere as a means of strength to individual freedom of mind in preference to officially disciplined uniformity for which history indicates a disappointing and disastrous end.

The subject now before us exemplifies this principle. Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction. If it is to impose any ideological discipline, however, each party or denomination must seek to control, or failing that, to weaken the influence of the educational system. Observance of the limitations of the Constitution will not weaken government in the field appropriate for its exercise.

2. It was also considered in the *Gobitis* case that functions of educational officers in States, counties and school districts were such that to interfere with their authority "would in effect make us the school board for the country." *Id.* at 598.

The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

Such Boards are numerous and their territorial jurisdiction often small. But small and local authority may feel less sense of responsibility to the Constitution, and agencies of publicity may be less vigilant in calling it to ac-

count. The action of Congress in making flag observance voluntary [17] and respecting the conscience of the objector in a matter so vital as raising the Army [18] contrasts sharply with these local regulations in matters relatively trivial to the welfare of the nation. There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond reach of the Constitution.

3. The *Gobitis* opinion reasoned that this is a field "where courts possess no marked and certainly no controlling competence," that it is committed to the legislatures as well as the courts to guard cherished liberties and that it is constitutionally appropriate to "fight out the wise use of legislative authority in the forum of public opinion and before legislative assemblies rather than to transfer such a contest to the judicial arena," since all the "effective means of inducing political changes are left free." *Id.* at 597–598, 600.

The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

---

[17] Section 7 of House Joint Resolution 359, approved December 22, 1942, 56 Stat. 1074, 36 U. S. C. (1942 Supp.) § 172, prescribes no penalties for nonconformity but provides:

"That the pledge of allegiance to the flag, 'I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all,' be rendered by standing with the right hand over the heart. However, civilians will always show full respect to the flag when the pledge is given by merely standing at attention, men removing the headdress . . ."

[18] § 5 (a) of the Selective Training and Service Act of 1940, 50 U. S. C. (App.) § 307 (g).

In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a "rational basis" for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case.

Nor does our duty to apply the Bill of Rights to assertions of official authority depend upon our possession of marked competence in the field where the invasion of rights occurs. True, the task of translating the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the problems of the twentieth century, is one to disturb self-confidence. These principles grew in soil which also produced a philosophy that the individual was the center of society, that his liberty was attainable through mere absence of governmental restraints, and that government should be entrusted with few controls and only the mildest supervi-

sion over men's affairs. We must transplant these rights to a soil in which the *laissez-faire* concept or principle of non-interference has withered at least as to economic affairs, and social advancements are increasingly sought through closer integration of society and through expanded and strengthened governmental controls. These changed conditions often deprive precedents of reliability and cast us more than we would choose upon our own judgment. But we act in these matters not by authority of our competence but by force of our commissions. We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed.

4. Lastly, and this is the very heart of the *Gobitis* opinion, it reasons that "National unity is the basis of national security," that the authorities have "the right to select appropriate means for its attainment," and hence reaches the conclusion that such compulsory measures toward "national unity" are constitutional. *Id.* at 595. Upon the verity of this assumption depends our answer in this case.

National unity as an end which officials may foster by persuasion and example is not in question. The problem is whether under our Constitution compulsion as here employed is a permissible means for its achievement.

Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men. Nationalism is a relatively recent phenomenon but at other times and places the ends have been racial or territorial security, support of a dynasty or regime, and particular plans for saving souls. As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever-increasing severity.

As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be. Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings. There is no mysticism in the American concept of the State or of the nature or origin of its authority. We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority.

The case is made difficult not because the principles of its decision are obscure but because the flag involved is our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism

and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.[19]

We think the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.

The decision of this Court in *Minersville School District* v. *Gobitis* and the holdings of those few *per curiam* decisions which preceded and foreshadowed it are overruled, and the judgment enjoining enforcement of the West Virginia Regulation is

*Affirmed.*

MR. JUSTICE ROBERTS and MR. JUSTICE REED adhere to the views expressed by the Court in *Minersville School*

---

[19] The Nation may raise armies and compel citizens to give military service. *Selective Draft Law Cases*, 245 U. S. 366. It follows, of course, that those subject to military discipline are under many duties and may not claim many freedoms that we hold inviolable as to those in civilian life.

*District* v. *Gobitis,* 310 U. S. 586, and are of the opinion that the judgment below should be reversed.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, concurring:

We are substantially in agreement with the opinion just read, but since we originally joined with the Court in the *Gobitis* case, it is appropriate that we make a brief statement of reasons for our change of view.

Reluctance to make the Federal Constitution a rigid bar against state regulation of conduct thought inimical to the public welfare was the controlling influence which moved us to consent to the *Gobitis* decision. Long reflection convinced us that although the principle is sound, its application in the particular case was wrong. *Jones* v. *Opelika,* 316 U. S. 584, 623. We believe that the statute before us fails to accord full scope to the freedom of religion secured to the appellees by the First and Fourteenth Amendments.

The statute requires the appellees to participate in a ceremony aimed at inculcating respect for the flag and for this country. The Jehovah's Witnesses, without any desire to show disrespect for either the flag or the country, interpret the Bible as commanding, at the risk of God's displeasure, that they not go through the form of a pledge of allegiance to any flag. The devoutness of their belief is evidenced by their willingness to suffer persecution and punishment, rather than make the pledge.

No well-ordered society can leave to the individuals an absolute right to make final decisions, unassailable by the State, as to everything they will or will not do. The First Amendment does not go so far. Religious faiths, honestly held, do not free individuals from responsibility to conduct themselves obediently to laws which are either imperatively necessary to protect society as a whole from grave

and pressingly imminent dangers or which, without any general prohibition, merely regulate time, place or manner of religious activity. Decision as to the constitutionality of particular laws which strike at the substance of religious tenets and practices must be made by this Court. The duty is a solemn one, and in meeting it we cannot say that a failure, because of religious scruples, to assume a particular physical position and to repeat the words of a patriotic formula creates a grave danger to the nation. Such a statutory exaction is a form of test oath, and the test oath has always been abhorrent in the United States.

Words uttered under coercion are proof of loyalty to nothing but self-interest. Love of country must spring from willing hearts and free minds, inspired by a fair administration of wise laws enacted by the people's elected representatives within the bounds of express constitutional prohibitions. These laws must, to be consistent with the First Amendment, permit the widest toleration of conflicting viewpoints consistent with a society of free men.

Neither our domestic tranquillity in peace nor our martial effort in war depend on compelling little children to participate in a ceremony which ends in nothing for them but a fear of spiritual condemnation. If, as we think, their fears are groundless, time and reason are the proper antidotes for their errors. The ceremonial, when enforced against conscientious objectors, more likely to defeat than to serve its high purpose, is a handy implement for disguised religious persecution. As such, it is inconsistent with our Constitution's plan and purpose.

MR. JUSTICE MURPHY, concurring:

I agree with the opinion of the Court and join in it.

The complaint challenges an order of the State Board of Education which requires teachers and pupils to participate in the prescribed salute to the flag. For refusal to conform with the requirement, the State law prescribes ex-

pulsion. The offender is required by law to be treated as unlawfully absent from school and the parent or guardian is made liable to prosecution and punishment for such absence. Thus not only is the privilege of public education conditioned on compliance with the requirement, but noncompliance is virtually made unlawful. In effect compliance is compulsory and not optional. It is the claim of appellees that the regulation is invalid as a restriction on religious freedom and freedom of speech, secured to them against State infringement by the First and Fourteenth Amendments to the Constitution of the United States.

A reluctance to interfere with considered state action, the fact that the end sought is a desirable one, the emotion aroused by the flag as a symbol for which we have fought and are now fighting again,—all of these are understandable. But there is before us the right of freedom to believe, freedom to worship one's Maker according to the dictates of one's conscience, a right which the Constitution specifically shelters. Reflection has convinced me that as a judge I have no loftier duty or responsibility than to uphold that spiritual freedom to its farthest reaches.

The right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all, except insofar as essential operations of government may require it for the preservation of an orderly society,—as in the case of compulsion to give evidence in court. Without wishing to disparage the purposes and intentions of those who hope to inculcate sentiments of loyalty and patriotism by requiring a declaration of allegiance as a feature of public education, or unduly belittle the benefits that may accrue therefrom, I am impelled to conclude that such a requirement is not essential to the maintenance of effective government and orderly society. To many it is deeply distasteful to join in a public chorus of affirmation of private belief. By some, in-

cluding the members of this sect, it is apparently regarded as incompatible with a primary religious obligation and therefore a restriction on religious freedom. Official compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship which, it is well to recall, was achieved in this country only after what Jefferson characterized as the "severest contests in which I have ever been engaged." [1]

I am unable to agree that the benefits that may accrue to society from the compulsory flag salute are sufficiently definite and tangible to justify the invasion of freedom and privacy that is entailed or to compensate for a restraint on the freedom of the individual to be vocal or silent according to his conscience or personal inclination. The trenchant words in the preamble to the Virginia Statute for Religious Freedom remain unanswerable: ". . . all attempts to influence [the mind] by temporal punishments, or burdens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, . . ." Any spark of love for country which may be generated in a child or his associates by forcing him to make what is to him an empty gesture and recite words wrung from him contrary to his religious beliefs is overshadowed by the desirability of preserving freedom of conscience to the full. It is in that freedom and the example of persuasion, not in force and compulsion, that the real unity of America lies.

MR. JUSTICE FRANKFURTER, dissenting:

One who belongs to the most vilified and persecuted minority in history is not likely to be insensible to the freedoms guaranteed by our Constitution. Were my purely personal attitude relevant I should wholeheartedly associate myself with the general libertarian views in the Court's opinion, representing as they do the thought and

---

[1] See Jefferson, Autobiography, vol. 1, pp. 53–59.

action of a lifetime. But as judges we are neither Jew nor Gentile, neither Catholic nor agnostic. We owe equal attachment to the Constitution and are equally bound by our judicial obligations whether we derive our citizenship from the earliest or the latest immigrants to these shores. As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard. The duty of a judge who must decide which of two claims before the Court shall prevail, that of a State to enact and enforce laws within its general competence or that of an individual to refuse obedience because of the demands of his conscience, is not that of the ordinary person. It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench. The only opinion of our own even looking in that direction that is material is our opinion whether legislators could in reason have enacted such a law. In the light of all the circumstances, including the history of this question in this Court, it would require more daring than I possess to deny that reasonable legislators could have taken the action which is before us for review. Most unwillingly, therefore, I must differ from my brethren with regard to legislation like this. I cannot bring my mind to believe that the "liberty" secured by the Due Process Clause gives this Court authority to deny to the State of West Virginia the attainment of that which we all recognize as a legitimate legislative end, namely, the promotion of good citizenship, by employment of the means here chosen.

Not so long ago we were admonished that "the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government."

*United States* v. *Butler,* 297 U. S. 1, 79 (dissent). We have been told that generalities do not decide concrete cases. But the intensity with which a general principle is held may determine a particular issue, and whether we put first things first may decide a specific controversy.

The admonition that judicial self-restraint alone limits arbitrary exercise of our authority is relevant every time we are asked to nullify legislation. The Constitution does not give us greater veto power when dealing with one phase of "liberty" than with another, or when dealing with grade school regulations than with college regulations that offend conscience, as was the case in *Hamilton* v. *Regents,* 293 U. S. 245. In neither situation is our function comparable to that of a legislature or are we free to act as though we were a super-legislature. Judicial self-restraint is equally necessary whenever an exercise of political or legislative power is challenged. There is no warrant in the constitutional basis of this Court's authority for attributing different rôles to it depending upon the nature of the challenge to the legislation. Our power does not vary according to the particular provision of the Bill of Rights which is invoked. The right not to have property taken without just compensation has, so far as the scope of judicial power is concerned, the same constitutional dignity as the right to be protected against unreasonable searches and seizures, and the latter has no less claim than freedom of the press or freedom of speech or religious freedom. In no instance is this Court the primary protector of the particular liberty that is invoked. This Court has recognized, what hardly could be denied, that all the provisions of the first ten Amendments are "specific" prohibitions, *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4. But each specific Amendment, in so far as embraced within the Fourteenth Amendment, must be equally respected, and the function of this

Court does not differ in passing on the constitutionality of legislation challenged under different Amendments.

When Mr. Justice Holmes, speaking for this Court, wrote that "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts," *Missouri, K. & T. Ry. Co.* v. *May,* 194 U. S. 267, 270, he went to the very essence of our constitutional system and the democratic conception of our society. He did not mean that for only some phases of civil government this Court was not to supplant legislatures and sit in judgment upon the right or wrong of a challenged measure. He was stating the comprehensive judicial duty and rôle of this Court in our constitutional scheme whenever legislation is sought to be nullified on any ground, namely, that responsibility for legislation lies with legislatures, answerable as they are directly to the people, and this Court's only and very narrow function is to determine whether within the broad grant of authority vested in legislatures they have exercised a judgment for which reasonable justification can be offered.

The framers of the federal Constitution might have chosen to assign an active share in the process of legislation to this Court. They had before them the well-known example of New York's Council of Revision, which had been functioning since 1777. After stating that "laws inconsistent with the spirit of this constitution, or with the public good, may be hastily and unadvisedly passed," the state constitution made the judges of New York part of the legislative process by providing that "all bills which have passed the senate and assembly shall, before they become laws," be presented to a Council of which the judges constituted a majority, "for their revisal and consideration." Art. III, New York Constitution of 1777. Judges exercised this legislative function in New York

for nearly fifty years. See Art. I, § 12, New York Constitution of 1821. But the framers of the Constitution denied such legislative powers to the federal judiciary. They chose instead to insulate the judiciary from the legislative function. They did not grant to this Court supervision over legislation.

The reason why from the beginning even the narrow judicial authority to nullify legislation has been viewed with a jealous eye is that it serves to prevent the full play of the democratic process. The fact that it may be an undemocratic aspect of our scheme of government does not call for its rejection or its disuse. But it is the best of reasons, as this Court has frequently recognized, for the greatest caution in its use.

The precise scope of the question before us defines the limits of the constitutional power that is in issue. The State of West Virginia requires all pupils to share in the salute to the flag as part of school training in citizenship. The present action is one to enjoin the enforcement of this requirement by those in school attendance. We have not before us any attempt by the State to punish disobedient children or visit penal consequences on their parents. All that is in question is the right of the State to compel participation in this exercise by those who choose to attend the public schools.

We are not reviewing merely the action of a local school board. The flag salute requirement in this case comes before us with the full authority of the State of West Virginia. We are in fact passing judgment on "the power of the State as a whole." *Rippey* v. *Texas,* 193 U. S. 504, 509; *Skiriotes* v. *Florida,* 313 U. S. 69, 79. Practically we are passing upon the political power of each of the forty-eight states. Moreover, since the First Amendment has been read into the Fourteenth, our problem is precisely the same as it would be if we had before us an Act of Congress for the District of Columbia. To suggest that we are here con-

cerned with the heedless action of some village tyrants is to distort the augustness of the constitutional issue and the reach of the consequences of our decision.

Under our constitutional system the legislature is charged solely with civil concerns of society. If the avowed or intrinsic legislative purpose is either to promote or to discourage some religious community or creed, it is clearly within the constitutional restrictions imposed on legislatures and cannot stand. But it by no means follows that legislative power is wanting whenever a general non-discriminatory civil regulation in fact touches conscientious scruples or religious beliefs of an individual or a group. Regard for such scruples or beliefs undoubtedly presents one of the most reasonable claims for the exertion of legislative accommodation. It is, of course, beyond our power to rewrite the State's requirement, by providing exemptions for those who do not wish to participate in the flag salute or by making some other accommodations to meet their scruples. That wisdom might suggest the making of such accommodations and that school administration would not find it too difficult to make them and yet maintain the ceremony for those not refusing to conform, is outside our province to suggest. Tact, respect, and generosity toward variant views will always commend themselves to those charged with the duties of legislation so as to achieve a maximum of good will and to require a minimum of unwilling submission to a general law. But the real question is, who is to make such accommodations, the courts or the legislature?

This is no dry, technical matter. It cuts deep into one's conception of the democratic process—it concerns no less the practical differences between the means for making these accommodations that are open to courts and to legislatures. A court can only strike down. It can only say "This or that law is void." It cannot modify or qualify, it cannot make exceptions to a general require-

ment. And it strikes down not merely for a day. At least the finding of unconstitutionality ought not to have ephemeral significance unless the Constitution is to be reduced to the fugitive importance of mere legislation. When we are dealing with the Constitution of the United States, and more particularly with the great safeguards of the Bill of Rights, we are dealing with principles of liberty and justice "so rooted in the traditions and conscience of our people as to be ranked as fundamental"—something without which "a fair and enlightened system of justice would be impossible." *Palko* v. *Connecticut,* 302 U. S. 319, 325; *Hurtado* v. *California,* 110 U. S. 516, 530, 531. If the function of this Court is to be essentially no different from that of a legislature, if the considerations governing constitutional construction are to be substantially those that underlie legislation, then indeed judges should not have life tenure and they should be made directly responsible to the electorate. There have been many but unsuccessful proposals in the last sixty years to amend the Constitution to that end. See Sen. Doc. No. 91, 75th Cong., 1st Sess., pp. 248–51.

Conscientious scruples, all would admit, cannot stand against every legislative compulsion to do positive acts in conflict with such scruples. We have been told that such compulsions override religious scruples only as to major concerns of the state. But the determination of what is major and what is minor itself raises questions of policy. For the way in which men equally guided by reason appraise importance goes to the very heart of policy. Judges should be very diffident in setting their judgment against that of a state in determining what is and what is not a major concern, what means are appropriate to proper ends, and what is the total social cost in striking the balance of imponderables.

What one can say with assurance is that the history out of which grew constitutional provisions for religious equal-

ity and the writings of the great exponents of religious freedom—Jefferson, Madison, John Adams, Benjamin Franklin—are totally wanting in justification for a claim by dissidents of exceptional immunity from civic measures of general applicability, measures not in fact disguised assaults upon such dissident views. The great leaders of the American Revolution were determined to remove political support from every religious establishment. They put on an equality the different religious sects—Episcopalians, Presbyterians, Catholics, Baptists, Methodists, Quakers, Huguenots—which, as dissenters, had been under the heel of the various orthodoxies that prevailed in different colonies. So far as the state was concerned, there was to be neither orthodoxy nor heterodoxy. And so Jefferson and those who followed him wrote guaranties of religious freedom into our constitutions. Religious minorities as well as religious majorities were to be equal in the eyes of the political state. But Jefferson and the others also knew that minorities may disrupt society. It never would have occurred to them to write into the Constitution the subordination of the general civil authority of the state to sectarian scruples.

The constitutional protection of religious freedom terminated disabilities, it did not create new privileges. It gave religious equality, not civil immunity. Its essence is freedom from conformity to religious dogma, not freedom from conformity to law because of religious dogma. Religious loyalties may be exercised without hindrance from the state, not the state may not exercise that which except by leave of religious loyalties is within the domain of temporal power. Otherwise each individual could set up his own censor against obedience to laws conscientiously deemed for the public good by those whose business it is to make laws.

The prohibition against any religious establishment by the government placed denominations on an equal foot-

ing—it assured freedom from support by the government to any mode of worship and the freedom of individuals to support any mode of worship. Any person may therefore believe or disbelieve what he pleases. He may practice what he will in his own house of worship or publicly within the limits of public order. But the lawmaking authority is not circumscribed by the variety of religious beliefs, otherwise the constitutional guaranty would be not a protection of the free exercise of religion but a denial of the exercise of legislation.

The essence of the religious freedom guaranteed by our Constitution is therefore this: no religion shall either receive the state's support or incur its hostility. Religion is outside the sphere of political government. This does not mean that all matters on which religious organizations or beliefs may pronounce are outside the sphere of government. Were this so, instead of the separation of church and state, there would be the subordination of the state on any matter deemed within the sovereignty of the religious conscience. Much that is the concern of temporal authority affects the spiritual interests of men. But it is not enough to strike down a non-discriminatory law that it may hurt or offend some dissident view. It would be too easy to cite numerous prohibitions and injunctions to which laws run counter if the variant interpretations of the Bible were made the tests of obedience to law. The validity of secular laws cannot be measured by their conformity to religious doctrines. It is only in a theocratic state that ecclesiastical doctrines measure legal right or wrong.

An act compelling profession of allegiance to a religion, no matter how subtly or tenuously promoted, is bad. But an act promoting good citizenship and national allegiance is within the domain of governmental authority and is therefore to be judged by the same considerations of power and of constitutionality as those involved in the many

claims of immunity from civil obedience because of religious scruples.

That claims are pressed on behalf of sincere religious convictions does not of itself establish their constitutional validity. Nor does waving the banner of religious freedom relieve us from examining into the power we are asked to deny the states. Otherwise the doctrine of separation of church and state, so cardinal in the history of this nation and for the liberty of our people, would mean not the disestablishment of a state church but the establishment of all churches and of all religious groups.

The subjection of dissidents to the general requirement of saluting the flag, as a measure conducive to the training of children in good citizenship, is very far from being the first instance of exacting obedience to general laws that have offended deep religious scruples. Compulsory vaccination, see *Jacobson* v. *Massachusetts,* 197 U. S. 11, food inspection regulations, see *Shapiro* v. *Lyle,* 30 F. 2d 971, the obligation to bear arms, see *Hamilton* v. *Regents,* 293 U. S. 245, 267, testimonial duties, see *Stansbury* v. *Marks,* 2 Dall. 213, compulsory medical treatment, see *People* v. *Vogelgesang,* 221 N. Y. 290, 116 N. E. 977—these are but illustrations of conduct that has often been compelled in the enforcement of legislation of general applicability even though the religious consciences of particular individuals rebelled at the exaction.

Law is concerned with external behavior and not with the inner life of man. It rests in large measure upon compulsion. Socrates lives in history partly because he gave his life for the conviction that duty of obedience to secular law does not presuppose consent to its enactment or belief in its virtue. The consent upon which free government rests is the consent that comes from sharing in the process of making and unmaking laws. The state is not shut out from a domain because the individual conscience may deny the state's claim. The individual con-

science may profess what faith it chooses. It may affirm and promote that faith—in the language of the Constitution, it may "exercise" it freely—but it cannot thereby restrict community action through political organs in matters of community concern, so long as the action is not asserted in a discriminatory way either openly or by stealth. One may have the right to practice one's religion and at the same time owe the duty of formal obedience to laws that run counter to one's beliefs. Compelling belief implies denial of opportunity to combat it and to assert dissident views. Such compulsion is one thing. Quite another matter is submission to conformity of action while denying its wisdom or virtue and with ample opportunity for seeking its change or abrogation.

In *Hamilton* v. *Regents,* 293 U. S. 245, this Court unanimously held that one attending a state-maintained university cannot refuse attendance on courses that offend his religious scruples. That decision is not overruled today, but is distinguished on the ground that attendance at the institution for higher education was voluntary and therefore a student could not refuse compliance with its conditions and yet take advantage of its opportunities. But West Virginia does not compel the attendance at its public schools of the children here concerned. West Virginia does not so compel, for it cannot. This Court denied the right of a state to require its children to attend public schools. *Pierce* v. *Society of Sisters,* 268 U. S. 510. As to its public schools, West Virginia imposes conditions which it deems necessary in the development of future citizens precisely as California deemed necessary the requirements that offended the student's conscience in the *Hamilton* case. The need for higher education and the duty of the state to provide it as part of a public educational system, are part of the democratic faith of most of our states. The right to secure such education in institutions not maintained by public funds is unquestioned.

But the practical opportunities for obtaining what is becoming in increasing measure the conventional equipment of American youth may be no less burdensome than that which parents are increasingly called upon to bear in sending their children to parochial schools because the education provided by public schools, though supported by their taxes, does not satisfy their ethical and educational necessities. I find it impossible, so far as constitutional power is concerned, to differentiate what was sanctioned in the *Hamilton* case from what is nullified in this case. And for me it still remains to be explained why the grounds of Mr. Justice Cardozo's opinion in *Hamilton* v. *Regents, supra,* are not sufficient to sustain the flag salute requirement. Such a requirement, like the requirement in the *Hamilton* case, "is not an interference by the state with the free exercise of religion when the liberties of the constitution are read in the light of a century and a half of history during days of peace and war." 293 U. S. 245, 266. The religious worshiper, "if his liberties were to be thus extended, might refuse to contribute taxes . . . in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government." *Id.,* at 268.

Parents have the privilege of choosing which schools they wish their children to attend. And the question here is whether the state may make certain requirements that seem to it desirable or important for the proper education of those future citizens who go to schools maintained by the states, or whether the pupils in those schools may be relieved from those requirements if they run counter to the consciences of their parents. Not only have parents the right to send children to schools of their own choosing but the state has no right to bring such schools "under a strict governmental control" or give "affirmative direction

concerning the intimate and essential details of such schools, entrust their control to public officers, and deny both owners and patrons reasonable choice and discretion in respect of teachers, curriculum, and textbooks." *Farrington* v. *Tokushige,* 273 U. S. 284, 298. Why should not the state likewise have constitutional power to make reasonable provisions for the proper instruction of children in schools maintained by it?

When dealing with religious scruples we are dealing with an almost numberless variety of doctrines and beliefs entertained with equal sincerity by the particular groups for which they satisfy man's needs in his relation to the mysteries of the universe. There are in the United States more than 250 distinctive established religious denominations. In the State of Pennsylvania there are 120 of these, and in West Virginia as many as 65. But if religious scruples afford immunity from civic obedience to laws, they may be invoked by the religious beliefs of any individual even though he holds no membership in any sect or organized denomination. Certainly this Court cannot be called upon to determine what claims of conscience should be recognized and what should be rejected as satisfying the "religion" which the Constitution protects. That would indeed resurrect the very discriminatory treatment of religion which the Constitution sought forever to forbid. And so, when confronted with the task of considering the claims of immunity from obedience to a law dealing with civil affairs because of religious scruples, we cannot conceive religion more narrowly than in the terms in which Judge Augustus N. Hand recently characterized it:

"It is unnecessary to attempt a definition of religion; the content of the term is found in the history of the human race and is incapable of compression into a few words. Religious belief arises from a sense of the inadequacy of rea-

son as a means of relating the individual to his fellowmen and to his universe. . . . [It] may justly be regarded as a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse." *United States* v. *Kauten,* 133 F. 2d 703, 708.

Consider the controversial issue of compulsory Bible-reading in public schools. The educational policies of the states are in great conflict over this, and the state courts are divided in their decisions on the issue whether the requirement of Bible-reading offends constitutional provisions dealing with religious freedom. The requirement of Bible-reading has been justified by various state courts as an appropriate means of inculcating ethical precepts and familiarizing pupils with the most lasting expression of great English literature. Is this Court to overthrow such variant state educational policies by denying states the right to entertain such convictions in regard to their school systems, because of a belief that the King James version is in fact a sectarian text to which parents of the Catholic and Jewish faiths and of some Protestant persuasions may rightly object to having their children exposed? On the other hand the religious consciences of some parents may rebel at the absence of any Bible-reading in the schools. See *Washington ex rel. Clithero* v. *Showalter,* 284 U. S. 573. Or is this Court to enter the old controversy between science and religion by unduly defining the limits within which a state may experiment with its school curricula? The religious consciences of some parents may be offended by subjecting their children to the Biblical account of creation, while another state may offend parents by prohibiting a teaching of biology that contradicts such Biblical account. Compare *Scopes* v. *State,* 154 Tenn. 105, 289 S. W. 363. What of conscien-

tious objections to what is devoutly felt by parents to be the poisoning of impressionable minds of children by chauvinistic teaching of history? This is very far from a fanciful suggestion for in the belief of many thoughtful people nationalism is the seed-bed of war.

There are other issues in the offing which admonish us of the difficulties and complexities that confront states in the duty of administering their local school systems. All citizens are taxed for the support of public schools although this Court has denied the right of a state to compel all children to go to such schools and has recognized the right of parents to send children to privately maintained schools. Parents who are dissatisfied with the public schools thus carry a double educational burden. Children who go to public school enjoy in many states derivative advantages such as free textbooks, free lunch, and free transportation in going to and from school. What of the claims for equality of treatment of those parents who, because of religious scruples, cannot send their children to public schools? What of the claim that if the right to send children to privately maintained schools is partly an exercise of religious conviction, to render effective this right it should be accompanied by equality of treatment by the state in supplying free textbooks, free lunch, and free transportation to children who go to private schools? What of the claim that such grants are offensive to the cardinal constitutional doctrine of separation of church and state?

These questions assume increasing importance in view of the steady growth of parochial schools both in number and in population. I am not borrowing trouble by adumbrating these issues nor am I parading horrible examples of the consequences of today's decision. I am aware that we must decide the case before us and not some other case. But that does not mean that a case is dissociated from the past and unrelated to the future. We must decide this

case with due regard for what went before and no less regard for what may come after. Is it really a fair construction of such a fundamental concept as the right freely to exercise one's religion that a state cannot choose to require all children who attend public school to make the same gesture of allegiance to the symbol of our national life because it may offend the conscience of some children, but that it may compel all children to attend public school to listen to the King James version although it may offend the consciences of their parents? And what of the larger issue of claiming immunity from obedience to a general civil regulation that has a reasonable relation to a public purpose within the general competence of the state? See *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535. Another member of the sect now before us insisted that in forbidding her two little girls, aged nine and twelve, to distribute pamphlets Oregon infringed her and their freedom of religion in that the children were engaged in "preaching the gospel of God's Kingdom." A procedural technicality led to the dismissal of the case, but the problem remains. *McSparran* v. *Portland*, 318 U. S. 768.

These questions are not lightly stirred. They touch the most delicate issues and their solution challenges the best wisdom of political and religious statesmen. But it presents awful possibilities to try to encase the solution of these problems within the rigid prohibitions of unconstitutionality.

We are told that a flag salute is a doubtful substitute for adequate understanding of our institutions. The states that require such a school exercise do not have to justify it as the only means for promoting good citizenship in children, but merely as one of diverse means for accomplishing a worthy end. We may deem it a foolish measure, but the point is that this Court is not the organ of government to resolve doubts as to whether it will fulfill its purpose. Only if there be no doubt that any rea-

sonable mind could entertain can we deny to the states the right to resolve doubts their way and not ours.

That which to the majority may seem essential for the welfare of the state may offend the consciences of a minority. But, so long as no inroads are made upon the actual exercise of religion by the minority, to deny the political power of the majority to enact laws concerned with civil matters, simply because they may offend the consciences of a minority, really means that the consciences of a minority are more sacred and more enshrined in the Constitution than the consciences of a majority.

We are told that symbolism is a dramatic but primitive way of communicating ideas. Symbolism is inescapable. Even the most sophisticated live by symbols. But it is not for this Court to make psychological judgments as to the effectiveness of a particular symbol in inculcating concededly indispensable feelings, particularly if the state happens to see fit to utilize the symbol that represents our heritage and our hopes. And surely only flippancy could be responsible for the suggestion that constitutional validity of a requirement to salute our flag implies equal validity of a requirement to salute a dictator. The significance of a symbol lies in what it represents. To reject the swastika does not imply rejection of the Cross. And so it bears repetition to say that it mocks reason and denies our whole history to find in the allowance of a requirement to salute our flag on fitting occasions the seeds of sanction for obeisance to a leader. To deny the power to employ educational symbols is to say that the state's educational system may not stimulate the imagination because this may lead to unwise stimulation.

The right of West Virginia to utilize the flag salute as part of its educational process is denied because, so it is argued, it cannot be justified as a means of meeting a "clear and present danger" to national unity. In passing it deserves to be noted that the four cases which unani-

mously sustained the power of states to utilize such an educational measure arose and were all decided before the present World War. But to measure the state's power to make such regulations as are here resisted by the imminence of national danger is wholly to misconceive the origin and purpose of the concept of "clear and present danger." To apply such a test is for the Court to assume, however unwittingly, a legislative responsibility that does not belong to it. To talk about "clear and present danger" as the touchstone of allowable educational policy by the states whenever school curricula may impinge upon the boundaries of individual conscience, is to take a felicitous phrase out of the context of the particular situation where it arose and for which it was adapted. Mr. Justice Holmes used the phrase "clear and present danger" in a case involving mere speech as a means by which alone to accomplish sedition in time of war. By that phrase he meant merely to indicate that, in view of the protection given to utterance by the First Amendment, in order that mere utterance may not be proscribed, "the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck* v. *United States,* 249 U. S. 47, 52. The "substantive evils" about which he was speaking were inducement of insubordination in the military and naval forces of the United States and obstruction of enlistment while the country was at war. He was not enunciating a formal rule that there can be no restriction upon speech and, still less, no compulsion where conscience balks, unless imminent danger would thereby be wrought "to our institutions or our government."

The flag salute exercise has no kinship whatever to the oath tests so odious in history. For the oath test was one of the instruments for suppressing heretical beliefs.

Saluting the flag suppresses no belief nor curbs it. Children and their parents may believe what they please, avow their belief and practice it. It is not even remotely suggested that the requirement for saluting the flag involves the slightest restriction against the fullest opportunity on the part both of the children and of their parents to disavow as publicly as they choose to do so the meaning that others attach to the gesture of salute. All channels of affirmative free expression are open to both children and parents. Had we before us any act of the state putting the slightest curbs upon such free expression, I should not lag behind any member of this Court in striking down such an invasion of the right to freedom of thought and freedom of speech protected by the Constitution.

I am fortified in my view of this case by the history of the flag salute controversy in this Court. Five times has the precise question now before us been adjudicated. Four times the Court unanimously found that the requirement of such a school exercise was not beyond the powers of the states. Indeed in the first three cases to come before the Court the constitutional claim now sustained was deemed so clearly unmeritorious that this Court dismissed the appeals for want of a substantial federal question. *Leoles* v. *Landers,* 302 U. S. 656; *Hering* v. *State Board of Education,* 303 U. S. 624; *Gabrielli* v. *Knickerbocker,* 306 U. S. 621. In the fourth case the judgment of the district court upholding the state law was summarily affirmed on the authority of the earlier cases. *Johnson* v. *Deerfield,* 306 U. S. 621. The fifth case, *Minersville District* v. *Gobitis,* 310 U. S. 586, was brought here because the decision of the Circuit Court of Appeals for the Third Circuit ran counter to our rulings. They were reaffirmed after full consideration, with one Justice dissenting.

What may be even more significant than this uniform recognition of state authority is the fact that every Jus-

tice—thirteen in all—who has hitherto participated in judging this matter has at one or more times found no constitutional infirmity in what is now condemned. Only the two Justices sitting for the first time on this matter have not heretofore found this legislation inoffensive to the "liberty" guaranteed by the Constitution. And among the Justices who sustained this measure were outstanding judicial leaders in the zealous enforcement of constitutional safeguards of civil liberties—men like Chief Justice Hughes, Mr. Justice Brandeis, and Mr. Justice Cardozo, to mention only those no longer on the Court.

One's conception of the Constitution cannot be severed from one's conception of a judge's function in applying it. The Court has no reason for existence if it merely reflects the pressures of the day. Our system is built on the faith that men set apart for this special function, freed from the influences of immediacy and from the deflections of worldly ambition, will become able to take a view of longer range than the period of responsibility entrusted to Congress and legislatures. We are dealing with matters as to which legislators and voters have conflicting views. Are we as judges to impose our strong convictions on where wisdom lies? That which three years ago had seemed to five successive Courts to lie within permissible areas of legislation is now outlawed by the deciding shift of opinion of two Justices. What reason is there to believe that they or their successors may not have another view a few years hence? Is that which was deemed to be of so fundamental a nature as to be written into the Constitution to endure for all times to be the sport of shifting winds of doctrine? Of course, judicial opinions, even as to questions of constitutionality, are not immutable. As has been true in the past, the Court will from time to time reverse its position. But I believe that never before these Jehovah's Witnesses

cases (except for minor deviations subsequently re-traced) has this Court overruled decisions so as to restrict the powers of democratic government. Always hereto-fore, it has withdrawn narrow views of legislative author-ity so as to authorize what formerly it had denied.

In view of this history it must be plain that what thirteen Justices found to be within the constitutional authority of a state, legislators can not be deemed un-reasonable in enacting. Therefore, in denying to the states what heretofore has received such impressive ju-dicial sanction, some other tests of unconstitutionality must surely be guiding the Court than the absence of a rational justification for the legislation. But I know of no other test which this Court is authorized to apply in nullifying legislation.

In the past this Court has from time to time set its views of policy against that embodied in legislation by finding laws in conflict with what was called the "spirit of the Constitution." Such undefined destructive power was not conferred on this Court by the Constitution. Before a duly enacted law can be judicially nullified, it must be forbidden by some explicit restriction upon political au-thority in the Constitution. Equally inadmissible is the claim to strike down legislation because to us as individuals it seems opposed to the "plan and purpose" of the Consti-tution. That is too tempting a basis for finding in one's personal views the purposes of the Founders.

The uncontrollable power wielded by this Court brings it very close to the most sensitive areas of public affairs. As appeal from legislation to adjudication becomes more frequent, and its consequences more far-reaching, judicial self-restraint becomes more and not less important, lest we unwarrantably enter social and political domains wholly outside our concern. I think I appreciate fully the objections to the law before us. But to deny that it presents a question upon which men might reasonably

differ appears to me to be intolerance. And since men may so reasonably differ, I deem it beyond my constitutional power to assert my view of the wisdom of this law against the view of the State of West Virginia.

Jefferson's opposition to judicial review has not been accepted by history, but it still serves as an admonition against confusion between judicial and political functions. As a rule of judicial self-restraint, it is still as valid as Lincoln's admonition. For those who pass laws not only are under duty to pass laws. They are also under duty to observe the Constitution. And even though legislation relates to civil liberties, our duty of deference to those who have the responsibility for making the laws is no less relevant or less exacting. And this is so especially when we consider the accidental contingencies by which one man may determine constitutionality and thereby confine the political power of the Congress of the United States and the legislatures of forty-eight states. The attitude of judicial humility which these considerations enjoin is not an abdication of the judicial function. It is a due observance of its limits. Moreover, it is to be borne in mind that in a question like this we are not passing on the proper distribution of political power as between the states and the central government. We are not discharging the basic function of this Court as the mediator of powers within the federal system. To strike down a law like this is to deny a power to all government.

The whole Court is conscious that this case reaches ultimate questions of judicial power and its relation to our scheme of government. It is appropriate, therefore, to recall an utterance as wise as any that I know in analyzing what is really involved when the theory of this Court's function is put to the test of practice. The analysis is that of James Bradley Thayer:

". . . there has developed a vast and growing increase of judicial interference with legislation. This is a very differ-

ent state of things from what our fathers contemplated, a century and more ago, in framing the new system. Seldom, indeed, as they imagined, under our system, would this great, novel, tremendous power of the courts be exerted,—would this sacred ark of the covenant be taken from within the veil. Marshall himself expressed truly one aspect of the matter, when he said in one of the later years of his life: 'No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of legislative acts. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other grounds, a just respect for the legislature requires that the obligation of its laws should not be unnecessarily and wantonly assailed.' And again, a little earlier than this, he laid down the one true rule of duty for the courts. When he went to Philadelphia at the end of September, in 1831, on that painful errand of which I have spoken, in answering a cordial tribute from the bar of that city he remarked that if he might be permitted to claim for himself and his associates any part of the kind things they had said, it would be this, that they had 'never sought to enlarge the judicial power beyond its proper bounds, nor feared to carry it to the fullest extent that duty required.'

"That is the safe twofold rule; nor is the first part of it any whit less important than the second; nay, more; today it is the part which most requires to be emphasized. For just here comes in a consideration of very great weight. Great and, indeed, inestimable as are the advantages in a popular government of this conservative influence,—the power of the judiciary to disregard unconstitutional legislation,—it should be remembered that the exercise of it, even when unavoidable, is always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people thus lose the political experience, and the moral education and stimulus that come from fighting the question out in the ordinary way, and correcting their own errors. If the decision in Munn v. Illinois and the 'Granger Cases,' twenty-five years ago, and in the 'Legal Tender Cases,' nearly thirty years

ago, had been different; and the legislation there in question, thought by many to be unconstitutional and by many more to be ill-advised, had been set aside, we should have been saved some trouble and some harm. But I venture to think that the good which came to the country and its people from the vigorous thinking that had to be done in the political debates that followed, from the infiltration through every part of the population of sound ideas and sentiments, from the rousing into activity of opposite elements, the enlargement of ideas, the strengthening of moral fibre, and the growth of political experience that came out of it all,—that all this far more than outweighed any evil which ever flowed from the refusal of the court to interfere with the work of the legislature.

"The tendency of a common and easy resort to this great function, now lamentably too common, is to dwarf the political capacity of the people, and to deaden its sense of moral responsibility. It is no light thing to do that.

"What can be done? It is the courts that can do most to cure the evil; and the opportunity is a very great one. Let them resolutely adhere to first principles. Let them consider how narrow is the function which the constitutions have conferred on them—the office merely of deciding litigated cases; how large, therefore, is the duty intrusted to others, and above all to the legislature. It is that body which is charged, primarily, with the duty of judging of the constitutionality of its work. The constitutions generally give them no authority to call upon a court for advice; they must decide for themselves, and the courts may never be able to say a word. Such a body, charged, in every State, with almost all the legislative power of the people, is entitled to the most entire and real respect; is entitled, as among all rationally permissible opinions as to what the constitution allows, to its own choice. Courts, as has often been said, are not to think of the legislators, but of the legislature—the great, continuous body itself, abstracted from all the transitory individuals who may happen to hold its power. It is this majestic representative of the people whose action is in question, a coördinate department of the government,

charged with the greatest functions, and invested, in contemplation of law, with whatsoever wisdom, virtue, and knowledge the exercise of such functions requires.

"To set aside the acts of such a body, representing in its own field, which is the very highest of all, the ultimate sovereign, should be a solemn, unusual, and painful act. Something is wrong when it can ever be other than that. And if it be true that the holders of legislative power are careless or evil, yet the constitutional duty of the court remains untouched; it cannot rightly attempt to protect the people, by undertaking a function not its own. On the other hand, by adhering rigidly to its own duty, the court will help, as nothing else can, to fix the spot where responsibility lies, and to bring down on that precise locality the thunderbolt of popular condemnation. The judiciary, today, in dealing with the acts of their coördinate legislators, owe to the country no greater or clearer duty than that of keeping their hands off these acts wherever it is possible to do it. For that course—the true course of judicial duty always—will powerfully help to bring the people and their representatives to a sense of their own responsibility. There will still remain to the judiciary an ample field for the determinations of this remarkable jurisdiction, of which our American law has so much reason to be proud; a jurisdiction which has had some of its chief illustrations and its greatest triumphs, as in Marshall's time, so in ours, while the courts were refusing to exercise it." J. B. Thayer, John Marshall, (1901) 104–10.

Of course patriotism can not be enforced by the flag salute. But neither can the liberal spirit be enforced by judicial invalidation of illiberal legislation. Our constant preoccupation with the constitutionality of legislation rather than with its wisdom tends to preoccupation of the American mind with a false value. The tendency of focussing attention on constitutionality is to make constitutionality synonymous with wisdom, to regard a law as all right if it is constitutional. Such an attitude is a great enemy of liberalism. Particularly in legislation affecting freedom of thought and freedom of speech much which should offend a free-spirited society is constitutional. Re-

liance for the most precious interests of civilization, there-
fore, must be found outside of their vindication in courts
of law.   Only a persistent positive translation of the faith
of a free society into the convictions and habits and actions
of a community is the ultimate reliance against unabated
temptations to fetter the human spirit.