Mrs. Susan RUSSO, Appellant,

v.

**CENTRAL SCHOOL DISTRICT NO. 1, TOWNS OF RUSH, ET AL., COUNTY OF MONROE, STATE OF NEW YORK, et al., Appellees.**

**No. 26, Docket 72-1303.**

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1972.

Decided Nov. 14, 1972.

Richard R. Rowley, Albany, N. Y. (Sneeringer & Rowley, Jeffrey G. Plant, Albany, N. Y., of counsel), for appellant.

William H. Morris, Rochester, N. Y. (Nixon, Hargrave Devans & Doyle, Robert H. Wendt, Rochester, N. Y., of counsel), for appellees.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Events that occur in small towns sometimes have a way of raising large constitutional questions. Henrietta, New York, a town of approximately 6,-500 residents, is the geographic setting of this important case, in which we are asked to decide whether the dismissal of Mrs. Susan Russo, a high school art teacher, for what in the end amounts to a silent refusal to participate in her school's daily flag salute ceremonies, violated her constitutional rights under the First Amendment. As in James v. Board of Education, 461 F.2d 566 (2d Cir. 1972), decided by the Court just a few months ago, we must ascertain, and ultimately assess, the sometimes conflicting interests of the state on the one hand, in maintaining and promoting the discipline necessary to the proper functioning of schools, and the interest of a teacher, on the other, freely to exercise fundamental rights of expression and belief guaranteed by the Bill of Rights. There is, however, more to this case than even that difficult balancing test requires, for we are mindful of the fact that the problems associated with the short-hand phrase, "flag salute," bare a complex of deep emotions, calling into question the meaning of patriotism and loyalty, and the different significance those words have for different people. This case, therefore, is made more difficult for us, "not because the principles of decision are obscure but because the flag involved is our own." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 641, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

I.

The facts, which we glean from the trial record below, are as follows. Susan Russo was appointed by the Board of Education for the Rush-Henrietta School District, as a probationary art teacher, and assigned, as of September 1, 1969, to the James E. Sperry High School in Henrietta. As a condition of her employment, Mrs. Russo was required by New York Education Law, McKinney's Consol.Laws, c. 16, § 3002 to sign a loyalty oath affirming her support of the Constitution of the United States and of New York State. She signed that oath, without reservation, on August 27, 1969.

In September, 1969, shortly after the school year began, a notice appeared on the school's bulletin board announcing that the "pledge of allegiance" would be recited each day and that "all students and staff members [were] expected to salute the flag." The practice at the Sperry School was to have the pledge read into the school's intercommunication system by a faculty member or a student. Students and teachers would then stand in their homeroom classes, and recite the pledge along with the voice over the public address system.

Mrs. Russo, in addition to her duties as an art instructor, was assigned to homeroom duty and charged with supervision of between twenty and twenty-five children, ranging from fourteen to sixteen years of age. Mrs. Catherine Adams, a teacher with seven years experience in the Rush-Henrietta school district, was also assigned to supervise the same homeroom, and to exercise senior authority in the classroom.

Although Mrs. Adams saluted the flag and recited the pledge each morning with her class, Mrs. Russo did not.

From her first day in school, when it came time to recite the pledge, Mrs. Russo rose and faced the flag, but neither recited the pledge nor saluted the flag. She simply stood at respectful attention, with her hands at her sides. Significantly, there is no evidence in the record indicating that Mrs. Russo ever tried to influence her students to follow her example, and no evidence disclosing even a trace of disruption in the classroom as a result of her action. The students all knew the pledge and, under Mrs. Adams's guidance, recited it each day, without incident. Mrs. Russo's belief, the sincerity of which is unchallenged in these proceedings, was that the phrase "liberty and justice for all" appearing in the pledge, which to most of us represents the spirit and abiding genius of our institutions, in her mind simply did not reflect the quality of life in America today. For this reason, she felt it to be an act of hypocrisy on her part to mouth the words of the pledge when she lacked a belief in either their accuracy or efficacy.

Although Mrs. Russo had not recited the pledge from the start of the school year in September, her action did not come to the attention of school officials until some time in April, 1970. In fact, as late as April 17, 1970, a teacher's report based on actual observation was prepared by James Bennett, an assistant principal at the Sperry school. He eval-

uated Mrs. Russo's classroom performance as favorable in all respects.[1]

About that time, in April 1970, certain students and parents reported to the principal, Donald Loughlin, that Mrs. Russo was not saluting the flag. On the morning of April 19, Loughlin entered Mrs. Russo's homeroom class and observed her standing in silence as the pledge was being recited. The following day Mrs. Russo was summoned to Loughlin's office and asked to explain her behavior. Mrs. Russo did so, as we have indicated, adding that her unwillingness to recite the pledge and salute the flag was a matter of personal conscience.

It was hardly coincidence that school officials were informed of Mrs. Russo's behavior in the spring of 1970. During the preceding months the school's flag salute regulations had become a matter of some controversy in Henrietta, and its surrounding towns. A directive of the school Board issued on February 2, reminded school principals that all students were to stand during the pledge. On April 14, the Board reversed itself and announced that students who were unable to participate in the pledge ceremonies because of sincere conscientious belief, would be permitted to remain seated during the pledge if they chose to do so. This Board regulation was the subject of bitter dispute at an open meeting of the school Board. A few

---

1. The portion of Bennett's report, listed as "Summary and Recommendations" appears below:

I have taken the opportunity to "pass through" several of Mrs. Russo's classes throughout the year and observe her students at work and I have observed her Studio in Art class for an entire period. The current project in that class is a work, preferably in 3-D or a stylistic interpretation, involving social commentary.

Comments—

Mrs. Russo has a congenial, relaxed personality and meets students at their level. The pupil-teacher relationship has always appeared quite good.

Teaching methods and techniques appear to be resourceful and appropriate to individualized instruction in a creative atmosphere. The teacher adopts the role of resource person and helper —guiding individual initiative.

The teacher plans basic time periods for each project but is flexible in regard to completion time so as to allow for individual differences. Those that finish a project early are encouraged to practice drawing and painting skills.

Student participation has generally appear to be at a high level—most seem busy at work generally.

" . . . . . "

By this account, Mrs. Russo appears to have been an exemplary teacher.

days later, on May 1, Principal Loughlin visited Mrs. Russo's class for a second time and observed her activity during the pledge. At a subsequent meeting in his office, Loughlin told Mrs. Russo that he intended to recommend that her probationary appointment not be renewed unless she resigned. Mrs. Russo asked Loughlin for the reasons underlying his decision, but he refused to supply any, stating that he was not compelled to explain his action with respect to a probationary teacher.[2] Mrs. Russo refused to resign.

On May 12, Loughlin wrote Superintendent of Schools Richard E. Ten-Haken, recommending that Mrs. Russo not be reappointed for the coming academic year, and that her employment status be terminated, effective June 30. On the evening of May 12, however, the school board announced new regulations governing student conduct during the pledge. The new regulations modified the policy adopted on April 14 by requiring all students who refused to salute the flag to stand in respectful silence. Finally, at a meeting of the school board, held on June 23, Mrs. Russo was dismissed from service at the Sperry school. No reasons for her dismissal were set forth by the Board. A notice of termination sent to Mrs. Russo by the District Clerk similarly did not provide any statement of the grounds for her dismissal.

## II.

■ This action was brought by Mrs. Russo pursuant to provisions of the Civil Rights Act, 42 U.S.C. § 1983,[3] and 28 U.S.C. § 1343,[4] alleging that her dismissal for refusing to pledge allegiance to the flag violated her First Amendment rights, and that the Board's failure to state reasons for her dismissal denied her the procedural protections safeguarded by the Due Process Clause of the Fourteenth Amendment. Mrs. Russo seeks reinstatement with back pay, and damages. In view of our decision on the merits of the First Amendment

2. New York Education Law sec. 3012, Tenure, provides:
 1. Teachers, principals, supervisors and all other members of the teaching and supervising staff shall be appointed by the board of education . . . upon the recommendation of [the] superintendent of schools, for a probationary period of three years. The service of a person appointed to any of such positions may be discontinued at any time during such probationary period, on the recommendation of the superintendent of schools, by a majority vote of the board of education.
 2. At the expiration of the probationary term of a person appointed for such term, subject to the conditions of this section, the superintendent of schools shall make a written report to the board of education recommending for appointment on tenure those persons who have been found competent, efficient and satisfactory. . . .

3. 42 U.S.C. sec. 1983, Civil Action for Deprivation of Rights provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

4. 28 U.S.C. sec. 1343. Civil Rights and Elective Franchise, provides:
 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

challenge,[5] we do not reach Mrs. Russo's Due Process claim.[6]

As a preliminary matter we are constrained to comment on the cryptic findings filed by the court below. After trial, Judge Burke dismissed Mrs. Russo's complaint on the merits, holding, in a brief series of findings and conclusions unaccompanied by any opinion, that neither First nor Fourteenth Amendment rights were violated in the dismissal of June 30, 1970. Judge Burke recited without explanation that Mrs. Russo's probationary appointment was terminated because of: (1) "her failure to follow school regulations," (2) "her refusal to teach a course in the art department," (3) "her lack of cooperation," (4) "her refusal to participate in the pledge of allegiance," (5) "her failure to perform all her duties," and (6) "her involvement of the student body in her conflict with the school."

 Ordinarily, of course, Rule 52, F.R.Civ.P., binds us to accept findings of fact made by the district court unless they are "clearly erroneous." But equally compelling is the demand in Rule 52(a) that "in all actions tried upon the facts without a jury . . . the court shall find the facts specially . . . ." The degree of specificity and particularity with which the facts must be found may vary, depending upon the circumstances of each case, see Kelley v. Everglades Drainage District, 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943). But we must remember that an important function of findings of fact is to aid an appellate court on review, see Advisory Committee Note to Rule 52(a) (1946); 5A Moore, Federal Practice ¶ 52.01 [5]. Findings that are nothing but cold rhetoric, couched in extraordinarily broad and general terms, and stripped of underlying analysis or justification or an accompanying memorandum or opinion shedding some light on the reasoning employed, invite closer scrutiny, especially when the case concerns fundamental constitutional freedoms. See, Schneiderman v. United States, 320 U.S. 118, 129–131, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). The need for precision and clarity in fact-finding and the use of cold conclusory statements as a shield to prevent penetrating the absence of facts is made more significant because of the "clearly errone-

5. We reach the merits here because Mrs. Russo did not have any state administrative remedies to exhaust before filing this action under 42 U.S.C. sec. 1983, see Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). Mrs. Russo did file a grievance notice pursuant to the contractual grievance procedure in the district. The Superintendent of Schools informed Mrs. Russo that non-renewal determinations of probationary teachers were not subject to grievance procedures. Of course, exhaustion of state judicial remedies is not a predicate to a federal court's jurisdiction in a sec. 1983 claim, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

6. Because we hold that Mrs. Russo was dismissed solely because of the exercise of her first Amendment rights we need not decide what effect the Supreme Court's recent decisions in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), might have on future dismissals of probationary teachers in New York. We note only that by statute, probationary teachers in New York are hired for a period of three years. Whether this is a sufficient period to establish the kind of "claim of entitlement" which the Court spoke of in Sindermann as being in the nature of a property right in employment that triggers the application of procedural safeguards before such a claim may be taken away is a question we leave for another day. In this context, however, we note the admirable efforts of the New York legislature to afford protection to probationers. A recent 1972 amendment to New York's Education Law specifically requires that teachers who are not recommended for tenure or who are recommended for dismissal henceforth will be entitled to a written statement giving the reasons for such recommendation. New York Education Law § 3031, McKinney's Sessions Laws, c. 866, 1972.

ous" standard, for while errors of law are always correctable by an appellate court, errors of fact rarely are, unless an appellant can scale the high wall which that standard places before him.[7] It stands to reason that unless due care is given to the process of fact finding, the reliability of the district court's conclusions will be subject to question, thus compelling a reviewing court to scrutinize the findings with a sharper eye than is ordinarily appropriate.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are of the view that except with regard to the finding concerning Mrs. Russo's re-fusal to recite the pledge, the "findings of fact" by the district court with respect to her dismissal are clearly erroneous.

Although Judge Burke lists six grounds for Mrs. Russo's dismissal, his findings discuss only the refusal to salute the flag and the "ceramics incident," a matter about which we shall have more to say in a moment. We are at a loss to understand what Judge Burke meant by his comments upon Mrs. Russo's "failure to follow school regulations," "her lack of cooperation," and her "failure to perform all her duties," unless these "findings" in some way refer to her failure to recite the pledge.[8] Although there was mention in the record of one occasion on which Mrs. Russo, because of some confusion, did not report for hall duty as assigned, we hardly imagine that Judge Burke gave

---

7. *See*, United States v. Forness, 125 F.2d 928 (2d Cir.) cert. denied, City of Salamanca v. United States, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). Judge Frank, for the court wrote:

> Chief Justice Hughes once remarked, "An unscrupulous administrator might be tempted to say 'Let me find the facts for the people of my country, and I care little who lays down the general principles.'" That comment should be extended to include facts found without due care as well as unscrupulous fact-finding: for such lack of due care is less likely to reveal itself than lack of scruples, which, we trust, seldom exists. And Chief Justice Hughes' comment is just as applicable to the careless fact-finding of a judge as to that of an administrative officer. The judiciary properly holds administrative officers to high standards in the discharge of the fact-finding function. The judiciary should at least measure up to the same standards.

125 F.2d at 942.

8. Loughlin's testimony at trial would appear to indicate that this is indeed the case. He said: "I also told the school board that she [Russo] had failed to comply with school regulations. It happened to be saluting the flag, but it was a school regulation . . . ." Loughlin also offered testimony that indicated that the failure to salute and the ceramics incident were the only significant factors involved in the decision to dismiss Mrs. Russo. He said: "I stated to the Board, as I had to the Superintendent, that I would not recommend Mrs. Russo because she had been insubordinate in refusing to follow a school regulation. And this coupled with her attitude on the statement she made concerning not teaching ceramics generally was the basis (for non-renewal)."

The extent to which Loughlin was influenced by Mrs. Russo's silent refusal to salute the flag is well-illustrated by a teacher "observation" report he filed concerning Mrs. Russo's classroom performance. The report rates Mrs. Russo's "professional characteristics" as "below average" or "poor" in five of six categories, and concludes with the comment: "Mrs. Russo, a first year teacher, has not met her responsibilities to my satisfaction." The report is dated June, 1970, and appears to refer to the entire 1969–1970 school year. Curiously, Loughlin did not see fit to submit a report about Mrs. Russo's classroom performance until he decided to dismiss her, and he did not decide to dismiss her until he learned of her refusal to participate in the pledge exercise. When Loughlin's report is contrasted with Bennett's glowing evaluation, submitted two months earlier, Loughlin's "observation" clearly appears to have been an after-thought and a mere contrivance to establish non-first amendment grounds to justify Mrs. Russo's dismissal.

such weight to this trivial occurrence as to attach to it three separate violations. Finally, the court found that Mrs. Russo had involved the student body in her dispute with the principal. We find no evidence in the record to support such a finding.[9]

■ The ceramics incident remains an obscure contretemps characterizing the personal relationships at Sperry High School. It is obscure inasmuch as principal Loughlin's account of the occurrence was constantly interrupted by the court, making cogent narration of the event a virtual impossibility. It appears that Loughlin and three members of the school's art department, including Mrs. Russo, met on April 15, 1970 to discuss the qualifications of a teacher who had already been hired to teach ceramics the following year. At that time, Mrs. Russo made the statement that she would not teach ceramics. Loughlin testified quite clearly, however, that he had never asked Mrs. Russo to teach ceramics. Mrs. Russo's version, as she explained to the court, was that she intended her statement as advice to Mr. Loughlin, which she offered in her capacity as one of the three art department teachers present at the meeting. She did not intend to indicate a refusal to teach ceramics, for that issue was not in question. She meant only to say that if she were possessed of the minimal qualifications and training of the replacement ceramics teacher she would not undertake to teach that course. In view of Loughlin's testimony that Mrs. Russo was never asked to teach ceramics, and the fact that a new teacher had already been hired to serve that function, it simply is not believable that Mrs. Russo's statement was meant in any way as a challenge to Loughlin's authority, or that it could have been construed as such.

We are left, then, with the ultimate conclusion that Mrs. Russo's dismissal resulted directly from her refusal to engage in the school's daily flag ceremonies and that all the remaining findings were trimmings to cloak the conduct of the Board and to justify the court's conclusions. We do, however, accept the lower court's findings that school policy required teachers to lead their classes in the pledge exercise and that Mrs. Russo was aware of her responsibility in this respect.

■ The question, then, is whether dismissal of a high school teacher may be sustained when the sole ground for that dismissal is the teacher's refusal to comply with a school regulation which required her to participate with her class in the pledge of allegiance. To this question we now turn.

### III.

If the central character in this drama were one of Mrs. Russo's students, rather than the teacher herself, we might dispose of this case with a simple reference to the Supreme Court's decision in West Virginia State Board of Education v. Barnette, *supra*. There the Court was of the view that "in connection with the pledge, the flag salute is a form of utterance." 319 U.S. at 632, 63 S.Ct. at 1182. "To sustain the compulsory flag salute," the Court said, "we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." 319 U.S. at 634, 63 S.Ct. at 1183. The Court declined to do so, and invalidated a West Virginia statute and a Board of Education resolution

9. There is some evidence in the record that the school's student body president discussed Mrs. Russo's situation in the school lunchroom, but there is not the slightest hint that Mrs. Russo encouraged him to do so. Indeed, there is evidence indicating that when Mrs. Russo learned of the situation she asked the boy to stop speaking. A petition was circulated by certain students in Mrs. Russo's behalf. Again there is no evidence even tending to show that she encouraged that activity.

promulgated under its authority, that required all students to recite the pledge, or suffer expulsion from school.

■■ Thus, there is no question but that the refusal to recite the pledge and salute the flag is a form of expression, and it matters not that the expression takes the form of silence, *see* Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). But here we are concerned with a teacher, and we are asked to determine whether the responsibilities which that teacher has voluntarily assumed, to shape and to direct the supple and still impressionable minds of her students in accordance with policies of the school board, somehow lessen the constitutional rights she would otherwise enjoy. In a related context the Supreme Court has said: "To the extent that the [lower] Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court [citations omitted]. 'The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents [385 U.S. 589 (1970)] at 605–606, 87 S.Ct. [675] at 685, 17 L.Ed. 629." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *see also* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). Nevertheless, it is also true that society will not "tolerate undisciplined, coercive, intimidating or disruptive activities on the part of teachers or students which threaten the essential functions of our schools . . . ." James v. Board of Education, *supra,* 461 F.2d, at 568, and that Boards of Education retain substantial discretion in controlling the edu-

cational process in their schools, *see generally,* Note, Developments in the Law —Academic Freedom, 81 Harv.L.Rev. 1045, 1098 (1968). Reasonable regulations designed to effect legitimate purposes, are well within the Board's power, and will be upheld against challenge, by the courts. *See, e. g.,* Presidents Council, Dist. 25 v. Community School Board, 457 F.2d 289, (2d Cir.) cert. denied, 309 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972).

■ It has been stated that children, in many instances, have more limited First Amendment rights than do adults. *See, e. g.,* Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L. Ed.2d 195 (1968) (obscenity); Emerson, Toward A General Theory of the First Amendment, 72 Yale L.J. 877, 938, 939 (1963); *see also,* Tinker v. Des Moines Independent School Dist., 393 U. S. 503, 512, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), (Stewart concurrence). But here, the school board, as it did in James v. Board of Education, *supra,* would have us decide that the rights enjoyed by school children are broader than the First Amendment rights of their teachers. In *James,* we declined that invitation. The *James* case, which called into question the right of a teacher to silently protest America's involvement in the Vietnam war by wearing a black armband in school, was decided after the Supreme Court's decision in *Tinker* which expressly granted that right to children, where no substantial disruption resulted from the protest. We held that Mr. James could not be dismissed from his employment as a teacher for engaging in protected expression. Similarly, in this instance, the Supreme Court's *Barnette* decision teaches that school children may not be compelled to utter the pledge of allegiance when it offends their conscientiously held beliefs to do so. There is little room in what Mr. Justice Jackson once called the "majestic generalities of the Bill of Rights," West Virginia State Board of Education v. Barnette, *supra,* 319 U.S., at 639, 63 S.Ct., at 1186, for an interpretation of the First Amend-

ment that would be more restrictive with respect to teachers than it is with respect to their students, where there has been no interference with the requirements of appropriate discipline in the operation of the school, Tinker v. Des Moines Independent School Dist., *supra,* 393 U.S., at 509, 89 S.Ct. 733. We add, however, as we did in *James,* that nothing in the First Amendment requires a school administration to wait until disruption has actually occurred before it may take protective action. Conduct which leads, or is likely to lead, to violence in the schools is not to be tolerated. James v. Board of Education, *supra,* 461 F.2d, at 572. But such conduct is not involved in this case. We take guidance, instead, from the Supreme Court's instruction in *Tinker,* whose lesson is that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736; *see also* Hanover v. Northrup, 325 F.Supp. 170 (D. Conn.1971).[10]

 Schools, of course, have a substantial interest in maintaining flag salute programs. New York's Education Law, § 802, imposes a duty upon the Commissioner of Education to prepare a program of flag salute for the public schools, and this duty has been given effect in Regulations of the New York Commissioner of Education, 8 CRRNY §§ 108.5, 108.7.[11] It is a proper, and appropriate function of our educational system to instill in young minds a healthy respect for the symbols of our national government. School officials, therefore, may enforce regulations whose purpose is to give effect to this legitimate state aim. But such regulations must be narrowly drawn for "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963), quoted in United States v. Robel, 389 U.S. 258, 265, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). Traditional First Amendment teaching requires that when "legitimate [state] concerns are expressed in a [provision] which imposes a substantial burden on protected First Amendment activities, [the state] must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms." (citations omitted). United States v. Robel, *supra,* at 268, 88 S.Ct., at 426; *see* Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969). This kind of precision and less restrictive ef-

---

10. In Hanover v. Northrup, *supra,* a district court, per Blumenfeld, J., applied the test of *Tinker* and held that the refusal of a teacher to lead or recite the pledge was expression which could not be forbidden at the risk of loss of employment.

11. New York Education Law § 802. Instruction Relating to Flag: Holidays

 1. It shall be the duty of the commissioner of education to prepare, for the use of the public schools of the state, a program providing for a salute to the flag and a daily pledge of allegiance to the flag, for instruction in its correct use and display and such other patriotic exercises as may be deemed by him to be expedient, under such regulations and instructions as may best meet the varied requirements of the different grades in such schools.

 Regulations of the Commissioner of Education.

 108.5 Pledge to the Flag. (a) It is recommended that schools use the following pledge to the flag:

 "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation, under God, indivisible, with liberty and justice for all."

 (b) In giving the pledge to the flag, the procedure is to render the pledge by standing with the right hand over the heart.

 108.7 Other Instructions. Instruction concerning the flag as a symbol of American life should not be limited to the observance of Flag Day. Before leaving the elementary school each child should come to think of himself as a "maker of the flag" and each pupil who passes through the secondary school should be guided in sober thought as to the meaning of "liberty and justice for all."

fect are noticeably lacking in the Board of Education regulations involved in this case and therefore do not meet the test of constitutional exactness required by the First Amendment.

Mrs. Russo neither disrupted her classes nor attempted to prevent her students from reciting the pledge. The record indicates that the class participated in the flag salute program each day under the capable supervision of the senior instructor, Mrs. Catherine Adams. During the pledge, Mrs. Russo acted in a way that can only be described as respectful: she stood in silence with her hands at her sides. We recall, at this point, that the April 14 action of the Board permitted protesting students to remain seated. We note, moreover, that although the federal statute which treats the pledge of allegiance, 36 U.S.C. § 172, suggests that the pledge be rendered by placing the hand over the heart, it also provides that "civilians will always show full respect to the flag when the pledge is given merely by standing at attention. . . ."

In view of all the circumstances in this case, it is clear that the state's interest in maintaining a flag salute program was well-served in Mrs. Russo's classroom, even without her participation in the pledge ceremonies. We do well to note that her pupils were not fresh out of their cradles: she had charge of a tenth grade homeroom class consisting of students ranging in ages between fourteen and sixteen years. Young men and women at this stage of development are approaching an age when they form their own judgments. They readily perceive the existence of conflicts in the world around them; indeed, unless we are to screen them from all newspapers and television, it will be only a rather isolated teenager who does not have some understanding of the political divisions that exist and have existed in this country. Nor is this knowledge something to be dreaded. As we said in *James*, "schools must play a central role in preparing their students to think and analyze and to recognize the

demagogue." Mrs. Russo made no attempt to proselytize her students. Instead, she provided her high school students with a second, but quiet, side of the not altogether new flag-salute debate: one teacher led the class in recitation of the pledge, the other remained standing in respectful silence. There is nothing to indicate that this demonstration had any effect—certainly no evidence of a destructive effect—on Mrs. Russo's students. Indeed, had it not been for the Board's precipitous action in dismissing her, the very fact that Mrs. Russo was permitted to refrain from saluting the flag would clearly have been evidence to her students that the injustice and intolerance against which she was quietly protesting was not merely not well-founded but a demonstrable falsehood at least within the confines of one school's homeroom class.

### VI.

By our holding today we do not mean to limit the traditionally broad discretion that has always rested with local school authorities to prescribe curriculum, set classroom standards, and evaluate conduct of teachers and students "in light of the special characteristics of the school environment." James v. Board of Education, *supra*. Nor do we imply that school officials are limited in their power to dismiss inept or obstreperous instructors, except, of course, to the extent they choose to so limit themselves. Public employment is not a sinecure to be retained regardless of merit simply by shouting loudly that any threat of dismissal is motivated by an anti-First Amendment animus. But where in fact, as in this case, a dismissal is directed because a teacher has engaged in constitutionally protected activity, that dismissal may not stand.

We emphasize, too, that despite our holding that Mrs. Russo may not be dismissed for refusing to pledge allegiance to the flag, we do not share her views. But because the First Amendment ranks among the most important of our constitutional rights we must rec-

ognize that the precious right of free speech requires protection even when the speech is personally obnoxious. Freedom of expression, as we said in *James*, requires "breathing room." Patriotism, particularly at a time when that virtuous quality appears much maligned, should not be the object of derision. But patriotism that is forced is a false partriotism just as loyalty that is coerced is the very antithesis of loyalty. We ought not impugn the loyalty of a citizen—especially one whose convictions appear to be as genuine and conscientious as Mrs. Russo's—merely for refusing to pledge allegiance, any more than we ought necessarily to praise the loyalty of a citizen who without conviction or meaning, and with mental reservation, recites the pledge by rote each morning. Surely patriotism and loyalty go deeper than that.

■ It is our conclusion that the right to remain silent in the face of an illegitimate demand for speech is as much a part of First Amendment protections as the right to speak out in the face of an illegitimate demand for silence, *see* Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); West Virginia State Board of Education v. Barnette, *supra*. Beliefs, particularly when they touch on sensitive questions of faith, when they involve not easily articulated intuitions concerning religion, nation, flag, liberty and justice, are most at home in a realm of privacy, and are happiest in that safe and secluded harbour of the mind that protects our innermost thoughts. To compel a person to speak what is not in his mind offends the very principles of tolerance and understanding which for so long have been the foundation of our great land. "If there is any fixed star in our constitutional constellation," Mr. Justice Jackson said in *Barnette*, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters

of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." West Virginia State Board of Education v. Barnette, *supra*, 319 U.S., at 642, 63 S.Ct., at 1187. We believe that to be an accurate and thoughtful statement of the underlying spirit of the First Amendment and we abide by it here.

Accordingly, the judgment is reversed, and the case is remanded to the district court for proceedings not inconsistent with this opinion.