No. 14-0144 – _Tug Valley Pharmacy LLC v. All Plaintiffs Below_

**FILED**

**May 28, 2015**

**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

Benjamin, Justice, concurring:

Bad cases can make bad law. This is a bad case. According to the parties, the plaintiffs are bad people and the defendants are bad people. Plaintiffs say defendants are "pill mills." Indeed, many have been prosecuted. Defendants say plaintiffs are common addicts who want to avoid self-responsibility, who engage in illegal conduct, and who simply want defendants to fund their future illicit drug use. It might be easy to simply decide the certified question based on gut emotions and the "badness" of the parties. However, then it would be this Court which would be engaging in "wrongful conduct."

My dissenting colleagues argue that we, as judges, should lock the courthouse doors to plaintiffs such as these. I agree that the underlying issue is one of access to our courts: When may a citizen's right to seek justice in our courts be barred and by whom? But my colleagues miss the _determinative_ fact which decides this case: ***The Legislature and the Governor already fully considered the policy issues related to a wrongful conduct rule and enacted a wrongful conduct rule for West Virginia while this case was pending on our docket.***[1] It's that simple.

---

[1] Governor Earl Ray Tomblin signed West Virginia's version of a wrongful conduct rule, H.D. Comm. Sub. for H.B. 2002, 82nd Sess. (W. Va. 2015), on March 5, 2015, the day after this case was argued before this court. _Infra._

-1-

Thus, the crucial issue in answering the certified question is whether we, as a Court, will properly defer to our sister branches on a policy matter *they* have already decided. Our job is simple: though it may not be popular, judicial conservatism compels this Court to give effect to the wisdom of the Legislature and the Governor, and answer in the affirmative.[2]  In other words, we as referees should follow the rules, not make them up as we go.

Allowing a plaintiff through the courthouse door, as we are compelled to do, does not mean the plaintiff can or will recover anything.  Here, I can't see how plaintiffs can recover on their claims.  First, I don't believe they can avoid a dismissal of their claims based upon their refusal to answer proper discovery questions. In filing this suit, plaintiffs are obligated to follow our Rules of Civil Procedure.  Refusal to do so should compel dismissal.  Second, plaintiffs must satisfactorily prove to the jury proximate causation of their alleged injuries by the wrongful conduct of the defendants. I am doubtful that will happen.

**A.**          **"It must be remembered that legislatures are the ultimate guardians of**

---

[2] No matter how we answer the certified question, our decision will be challenged. If we answer in the affirmative, some may argue that we are now allowing addicts to misuse our civil justice system.  If we answer in the negative, others will argue that we are improperly immunizing drug dealers from the consequences of their actions.  Ours is not to judge to a pre-determined result, but, instead, to use the principles of judicial conservatism and defer to our sister branches on this policy matter relating to access to our court system.

**the liberties and welfare of the people in quite as great a degree as the courts."** [3]

– Justice Oliver Wendell Holmes

The principles of judicial conservatism *require* us to give effect to the wisdom and consideration of our sister branches of government – the branches designed to make public policy – and not to bestow upon ourselves the role of superlegislature simply because we do not believe they went far enough. This is the very essence of our constitutional system and the democratic conception of our society.

The policy underlying judicial conservatism and deference by the courts to the legislature on policy matters was eloquently set forth by Justice Felix Frankfurter:

> As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard. The duty of a judge who must decide which of two claims before the Court shall prevail . . . is not that of the ordinary person. It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench.

*W.Va. State Board of Educ. v. Barnette*, 319 U.S. 624, 647 (1943) (Frankfurter, dissenting). Responsibility for the civil policies of the state lies with the legislature. While the wrongful conduct rule had not yet been considered by the Legislature when the circuit court considered the matter below and certified its question to this Court, such is not true for this Court's

---

[3] *Missouri, Kansas & Texas R. Co. v. May*, 194 U.S. 267, 270 (1904).

consideration of the rule. Prior to our decision in this case, the Legislature fully considered the matter, negotiated language between both houses, and established West Virginia's policy related to the wrongful conduct rule through action by a conference committee endorsed by each house.[4] It is not the job of a judge to decide policy issues that have been settled in such a democratic fashion by elected officials absent some constitutional error in the legislative action.

**B.        Our Legislature and Governor Have Already Decided This Policy Issue**

In exercising proper judicial restraint and deference, we must defer to our sister branches in declining to enact a wrongful conduct rule as broad as requested here by the defendants. In the 2015 legislative session, major changes were made to West Virginia law

---

[4] I disagree with my colleagues on the Majority with respect to the effect of the Legislature's actions herein. While this case may involve facts which predate the Legislature's actions, the Legislature nevertheless had, by the time of this decision, now studied the wrongful conduct rule and determined West Virginia's public policy. There can be no better way to establish West Virginia' public policy regarding the rule than to study and follow the Legislature's 2015 direction. This matter comes to us as a certified question asking *us* to make this public policy decision based upon a limited record. As tempting as it may be to adopt the more activist rationale of my dissenting colleagues, to do so would have this Court adopt a rule completely different from – and more restrictive than – that adopted by the Legislature. *In other words, my dissenting colleagues would bar citizens from the courts whom our legislators would not!* To ignore the clear direction of the Legislature would be absurd and disrespectful to our sister branch of government. Under no reading of the legislative action herein can *any* support be found for answering the certified question in the negative. I therefore join with the Majority to answer the certified question in the affirmative – I simply disagree with them with respect to the rationale for this decision.

under the heading termed, "civil justice reform," and proposed a form of wrongful conduct rule more restrictive than set forth in the certified question before us. Ultimately, after considerable negotiation and study, the Legislature restricted its language even further and forwarded an enrolled bill containing such a rule to the Governor, who signed it on March 5, 2015.[5] As signed, West Virginia's rule requires that a plaintiff be convicted of a felony

---

[5] At the beginning of the session, two bills that related to civil justice reform were introduced in the House of Delegates and the State Senate. These bills were designated H.B. 2002 and S.B. 2, respectively. Each contained the same proposed provision for a wrongful conduct rule for West Virginia. At the time these bills were introduced, this case was pending on our public docket for this term of court.

The House of Delegates took the lead. H.B. 2002, introduced on January 14, 2015, was referred to the House Judiciary Committee. As introduced, H.B. 2002 contained a wrongful conduct rule more restrictive than that advocated by the defendants herein:

> (d) In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a felony criminal act.

H.B. 2002, introduced January 14, 2015, modifying *West Virginia Code* §55-7-13d. H.B. 2002 included many other potential changes to our civil justice system, especially in the area of comparative fault. In the House Judiciary Committee, the proposed wrongful conduct rule was further restricted by amendment, adding a provision that the plaintiff must not only have engaged in a felonious act, but also that the plaintiff have been convicted of the felonious act before he or she would to be barred from maintaining an action in our courts:

> In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a felony criminal act*; Provided, That the plaintiff has been convicted of such felony, or if deceased, the jury makes a*

-5-

before he or she is barred from filing suit.

However one wishes to consider this issue, the fact remains that we are the third of the three branches to consider the proper wording for a wrongful conduct rule. Our Legislature and our Governor fully considered the policy implications of barring lawsuits and adopted a version of the wrongful conduct rule completely inconsistent with that advanced by defendants herein. Our duty is to accept the wisdom of the Legislature and the Governor on the wrongful conduct rule and give it effect.[6]

_____

*finding beyond a reasonable doubt that the decedent committed such felony.*

H.B. 2002, Committee Substitute, January 21, 2015. With this language, H.B. 2002, as amended, was adopted by the House of Delegates on January 27, 2015, and was communicated to the State Senate. It was introduced in the State Senate on January 28, 2015, and was referred to the Senate Judiciary Committee. The State Senate ultimately adopted the broader (original) House version of the wrongful conduct rule, without the requirement that the plaintiff be convicted of felonious conduct. The Senate approved the broader bill on February 9, 2015.

On February 12, 2015, the matter was referred to Conference. On February 19, 2015, the Conference Committee resolved the differences in the language of the competing wrongful conduct rules by adopting the more restrictive House version, thereby requiring a conviction for felonious conduct before the rule banning access to the courts would become applicable. As amended, the enrolled version of H.B. 2002 was sent to Governor Earl Ray Tomblin on March 2, 2015, and was signed by the Governor three days later. Having been on our public docket for the January 2015 Term of court, this case was presented for oral argument before this Court on March 4, 2005.

[6]As recently observed by Justice Loughry, "When the founding fathers decided that separation of powers between the legislative, executive, and judicial branches of government would be a wise approach to governing, they did not contemplate that one branch of government would simply seize the powers of another because it believes that it knows better. . . . It it not our place to second guess the Legislature's reasons for doing so." *Hammons v. WVOIC, et al.*, No. 12-1473 (J. Loughry, dissenting), at pp. 15-16 (filed May 20, 2015).

-6-

With impassioned rhetoric, my dissenting colleagues argue that this policy question is one for judges, not legislators -- in other words, my dissenting colleagues seem comfortable with the notion that referees should not just apply the rules, they should make them up too. Tempting as it might be for this Court to usurp the role of the Legislature and make such a power grab under these facts, that notion is antithetical to our judicial role. As we have previously observed,

> This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish, policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions.

Syl. pt. 2, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 679 S.E.2d 323 (2009).

I certainly understand the concerns raised by my dissenting colleagues. Let's face it, with parties such as these, it is indeed tempting, perhaps, to ignore just this once the principles of judicial conservatism and engage in a bit of judicial activism, i.e., legislating from the bench. But while such a result might certainly be received by the public as plain common-sense under these extreme facts, we cannot forget that each case we decide creates precedential authority which binds us in our future considerations of similar legal issues. The manner in which we decide this case may compel us to decide future cases in a manner less well-received by the public. As referees, it is for us to call the game under the established

-7-

rules, not to make up the rules to ensure a win for the home team and acceptance by the fans.[7]

**C.**       **The Presumption of Open Access to the Courts**

There is a presumption of open access to our courts in West Virginia:

> The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

Article 3, Section 17, Constitution of West Virginia ("Courts open to all – Justice administered swiftly"). This right to access to our courts is not absolute. The presumption may be rebutted. In certain circumstances, the legislature may curtail the ability of a citizen to access West Virginia's court system. "When legislation substantially impairs a person's vested rights or severely limits existing procedural remedies permitting court adjudication, thereby implicating the certain remedy provision of the constitution, the legislation will be upheld if . . . the purpose of the alternation or repeal of the remedy is to eliminate or curtail a clear social or economic problem . . . ." Syl. pt. 5, in part, *Lewis v. Canaan Valley Resorts*, 185 W. Va. 684, 408 S.E.2d 634 (1991) (discussing Skiing Responsibility Act).

---

[7] H.B. 2002, as enacted, contains a number of provisions related to civil justice reform. If the dissenters were to prevail here, thereby nullifying one of the reforms of H.B. 2002, one need not long ponder whether all other reforms contained within that bill would not likewise be subject to nullification by this Court.

The wrongful conduct rule requires us to confront our constitutional policy to provide access to our courts with our gut hesitation to aid a wrongdoer. The two salient points to be considered relating to a restriction or bar on the right to access our courts, such as implicated in a wrongful conduct rule, is that the curtailing act be legislative and that it be done for a clear public policy reason, i.e., "to eliminate or curtail a clear social or economic problem." *Id.* Here, the defendants would have us *judicially* establish a wrongful conduct rule which is plainly inconsistent with the Rule adopted by the Legislature. Ironically enough, *that* would be "wrongful conduct" on our part.

## D.        Considerations Specific to This Case

Although not related specifically to the certified question before this Court, I am concerned about a number of issues related to the maintenance of this lawsuit. These relate not only to the parties themselves, but also to aspects of this action itself. I raise these in part because of my belief that the legislature may wish at some point to amend its wrongful conduct rule.

Conceptually, a wrongful conduct rule can vary in its broadness. At its most broad, the rule could read: "A person may not maintain an action if he or she must rely in whole or in part on an illegal or *wrongful* act or transaction to which the person is a party." (Emphasis added.) Of course a wrongful act may be equated to simple negligence. At its

broadest, the rule would prevent a plaintiff from bringing an action in which he or she had any fault, no matter how small. Obviously, West Virginia's jurisprudence does not support such a broad rule.

The rule requested by defendants to be judicially adopted herein is nearly as broad: "A person may not maintain an action if he or she must rely in whole or in part on an illegal or *immoral* act or transaction to which the person is a party." (Emphasis added.) Our court system, based upon notice and predictability, is not one which easily accommodates the concept "immoral act or transaction." How does one define such a term in a constitutionally-derived system? Absent a legal definition of "immoral act or transaction" to guide a judge deciding a motion to dismiss, the phrase is so broad as to probably require all cases to proceed to a jury for its determination. At a minimum, inclusion of such a phrase may lead to inconsistency in the rule's application and be an insufficient guide to trial courts attempting to use the rule. The Legislature was perhaps aware of this and other legal authorities on the topic in view of its focus exclusively on illegal conduct as a threshold for the rule's applicability.[8]

_____

[8]A *See also* Restatement (Second), Torts §889 (1979) ("One is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or a crime . . . ."). This was a carry-over of the same language from Restatement (First) of Torts §889 (1939)

While one may point to the extreme facts of this case as a reason for the broader language advocated by defendants, it is obvious that our Legislature looked at a number of factors in codifying West Virginia's wrongful conduct rule. First, the Legislature was faced with what type of act should serve as the threshold for consideration of the rule. The types of actions which might have been considered range from felony convictions (a restrictive approach to banning access to the courts) to the much more difficult to define "immoral acts" (a much easier approach to banning access to the courts). The rule ultimately adopted by our Legislature prior to oral argument in this case goes to the more narrow or restrictive end of the spectrum. Not only would the Legislature require that a plaintiff's conduct amount to a violation of a serious law, i.e., a felony, it would also require that a plaintiff have also been convicted of such an offense. Second, the Legislature was concerned with the level of proof of an act necessary to invoke the rule. Here again, the Legislature could have opted for an easier civil preponderancy. It did not do so, however, opting for the "beyond a reasonable doubt" burden necessary for a conviction.[9]

The parties to this action are difficult to like. On the one hand, we have

---

[9] For example, the Legislature could have considered more moderate language: "In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a criminal act or transaction and such act is an integral and essential part of his or her injury." Such a standard, for example, requires only a criminal act directly related to the cause of action and does not require conviction.

plaintiffs whose character defendants take every opportunity to malign. Defendants point out that all, or nearly all, of the plaintiffs have refused to answer the most basic discovery questions about drug sources and providers. My dissenting colleagues take every opportunity to portray plaintiffs as criminals who are attempting to use our judicial system to profit from the negative consequences of their conduct. In other words, plaintiffs are bad people.

On the other hand, plaintiffs argue that defendants are, at best, profiting greatly from the drug problem of southern West Virginia by, at best, keeping their heads in the sand, and, at worst, being nothing more than drug dealers or pushers who just happen to have the letters "M.D.," "Inc.," or the like after their names. In other words, defendants are bad people.

One can easily understand the intuitive response simply to proclaim a pox on all of the parties' houses in this case and lock the courthouse door. In his dissent, Justice Loughry observes that there may well be no innocent victims here. Perhaps not. But I am also troubled that despite their own alleged bad acts, including criminal misconduct, defendants now seek to use the very same justice system they would deny to plaintiffs to shield themselves from such claims. How ironic it is that defendants claim a right for themselves that they would deny to plaintiffs.

I am disturbed by the contention that this case can proceed beyond discovery if the plaintiffs are permitted to use their Fifth Amendment right offensively to avoid self-incrimination to thwart defendants below from fully discovering their case. Questions related to the source and types of drugs used by plaintiffs would seem to be related directly to proximate causation and damages. By commencing this action seeking damages related to the use of drugs, plaintiffs have submitted themselves to the jurisdiction of the court and West Virginia's Rules of Civil Procedure. It is hard to fathom how plaintiffs have not put their drug use, regardless of source, into issue. As such, they should be compelled either to waive their Fifth Amendment privilege against self-incrimination and respond to discovery procedures, or have their complaint(s) dismissed. The privilege against self-incrimination was intended as a shield, not a sword. Otherwise, a plaintiff could use the Fifth Amendment to harass a defendant and thwart any attempt by the defendant to properly obtain evidence by which to necessary defend itself. *See generally, Galanty v. Steel Nat'l. Bank of Chicago*, 66 Ill. App. 3d 476, 481, 384 N.E.2d 57, 61 (1978); *Christenson v. Christenson*, 281 Minn. 507, 162 N.W.2d 194 (1968); *Annest v. Annest*, 49 Wash.2d 62, 298 P.2d 483(1956); *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955); *Lyons v. Johnson*, 415 F.2d 540 (9th Cir. 1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Brown v. Ames*, 346 F.Supp. 1176 (D.C.Minn., 1972); *Kisting v. Westchester Fire Ins. Co.*, 290 F.Supp. 141 (D.C.Wis., 1968), *aff'd*, 416 F.2d 967 (7th Cir.1969); *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266 (D.C.N.Y., 1958), *Stockham v. Stockham*, 168 So.2d 320

(Fla. 1964).

At the end of the day, plaintiffs must be able to show that defendants proximately caused their claimed injuries. I am not sure that is possible. Plaintiffs are seeking damages on the ground that the defendants caused them to become addicted to narcotic pain medication. If a medical provider did "hook" an otherwise innocent victim of a car or work-related accident onto drugs by his or her wrongful acts, a plaintiff may have a case. However, defendants contend that many of the plaintiffs herein were "doctor shopping," "self-medicating," and worse. Plaintiffs may not avoid focus on themselves as the cause of their maladies simply because some or all of the defendants engaged in bad acts too. Plaintiffs must show proximate causation.

Defendants below contend that there are sufficient "punishment" mechanisms in the law outside of the civil justice system to adequately sanction the defendants for any alleged misconduct in which they may have engaged. In other words, the criminal justice system and administrative licensing boards are available to punish defendants, so affording civil immunity to such defendants is acceptable.

While I find this to be a novel argument, it fails to take into account the purpose of the civil justice system. Here, plaintiffs seek to pursue their claims for their

alleged injuries related to the tortious conduct of the defendants. The criminal justice system is not a replacement for the civil justice system. Nor are administrative licensing boards. While each system may punish a bad doctor or protect future West Virginians from such a bad doctor, they are not designed to remedy the harm allegedly done by a doctor or pharmacist to an individual. For example, the victim of a bad lawyer may still pursue a civil action against the lawyer despite the lawyer be disbarred and prosecuted by the State. The civil action is the right of the individual.

Counsel also suggested that this Court's failure to adopt the expansive wrongful conduct rule sought by defendants would cause insurance rates to rise. This is an argument to be raised with the legislature and presumably was considered by the legislature in enacting H.B. 2002 in 2015. Certainly, a more expansive rule would result in fewer claims which could be made. On the other hand, the legislature must also worry that too expansive a rule would simply allow bad actors to hide behind the rule, thereby potentially hurting West Virginia citizens. Ultimately, this is a policy matter best left to the legislature.