# SUPREME COURT OF THE UNITED STATES

———

No. 21A145

———

## DR. A, ET AL., APPLICANTS *v.* KATHY HOCHUL, GOVERNOR OF NEW YORK, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[December 13, 2021]

The application for injunctive relief presented to JUSTICE SOTOMAYOR and by her referred to the Court is denied.

JUSTICE THOMAS would grant the application.

JUSTICE GORSUCH, with whom JUSTICE ALITO joins, dissenting from the denial of application for injunctive relief.

New York recently issued a regulation requiring healthcare workers to receive a COVID–19 vaccine. Those who cite medical reasons are exempt. But no comparable exemption exists for individuals whose sincere religious beliefs prevent them from taking one of the currently available vaccines. It seems New York is one of just three States to have a scheme like this. And it seems originally even New York was headed in a different direction. When it announced the mandate, the then-Governor promised a religious exemption. Weeks later, the State backtracked. It offered no scientific evidence, or even a written explanation, for the decision. But a new Governor who assumed office around the same time spoke about it. The new Governor announced that the decision to eliminate the exemption was "intentiona[l]" and justified because no "organized religion" sought it and individuals who did were not "listening to God and what God wants." Now, thousands of New York healthcare workers face the loss of their jobs and eligibility for unemployment benefits. Twenty of them have filed suit

arguing that the State's conduct violates the First Amendment and asking us to enjoin the enforcement of the mandate against them until this Court can decide their petition for certiorari.

Respectfully, I believe they deserve that relief.

## I

## A

The doctors and nurses who filed this suit and a companion case have gone to great lengths to serve their patients during the COVID–19 pandemic. Consider two of their stories.

Dr. J. is an OB/GYN who works in a New York hospital. She is also a devout Catholic. During the pandemic, she has consistently treated patients infected with COVID–19 in spite of the risks to herself. Sometimes, in emergencies, she has had to rush into a delivery room without knowing whether a delivering mother is infected with the disease. Dr. J. has done all this even while pregnant herself.

Dr. F. serves a rural town as an oral surgeon. Like Dr. J., he is Catholic and has never turned away a patient infected with COVID–19. Instead, he has faced open wounds and mouths even when it involved risks to his own health. Dr. F. says he has done so because, if he had refused, many of his patients seeking care could not have obtained it elsewhere.

These applicants are not "'anti-vaxxers'" who object to all vaccines. Complaint in No. 21–CV–01009 (NDNY), ¶ 37(g). Instead, the applicants explain, they cannot receive a COVID–19 vaccine because their religion teaches them to oppose abortion in any form, and because each of the currently available vaccines has depended upon abortion-derived fetal cell lines in its production or testing. The applicants acknowledge that many other religious believers feel differently about these matters than they do. But no one questions the sincerity of their religious beliefs.

B

Until very recently, none of this posed a difficulty. The pandemic began approximately 21 months ago. Vaccines became available to New York healthcare workers roughly 12 months ago. Through it all, the State allowed—and depended on—front-line healthcare workers like the applicants to serve their patients. Things only began to change four months ago when New York, for the first time, announced that it was contemplating a vaccine mandate. Even then, it did not seem the State's plans would pose a problem for the applicants or thousands of others like them. Governor Andrew Cuomo assured the public that any new mandate would contain "exceptions for those with religious or medical reasons." Governor Cuomo Announces COVID–19 Vaccination Mandate for Healthcare Workers (Aug. 16, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-vaccination-mandate-healthcare-workers. On August 18, 2021, health commissioner Howard Zucker issued the proposed mandate, indicating that it would take effect on September 27. Just as the Governor promised, it contained a religious exemption. App. to Application Exh. 8, pp. 103–104.

The trouble here began only when Mr. Cuomo left the Governor's office and Kathy Hochul assumed it. On August 23, one day before Governor Hochul took office, the State's Public Health and Health Planning Council—an advisory committee headed by Commissioner Zucker—proposed a revised mandate, this time with no religious exemption. The council issued the proposed regulation three days later. 10 N. Y. Admin. Code §2.61 (2021). The regulatory impact statement accompanying this decision did not discuss the feasibility of a religious exemption or the reasons for removing it.

But the new Governor did. In response to a reporter's question 12 days before the revised mandate was set to take effect on September 27, Governor Hochul acknowledged

that "we left off [the religious exemption] in our regulations intentionally." Governor Hochul Holds Q&A Following COVID–19 Briefing (Sept. 15, 2021), https://www. governor.ny.gov/news/video-rough-transcript-governor-hochul- holds-qa-following-covid-19-briefing. Asked why, the Governor answered that there is no "sanctioned religious exemption from any organized religion" and that organized religions are "encouraging the opposite." *Ibid.* Apparently contemplating Catholics who object to receiving a vaccine, Governor Hochul added that "everybody from the Pope on down is encouraging people to get vaccinated." *Ibid.*

Speaking to a different audience, the Governor elaborated: "How can you believe that God would give a vaccine that would cause you harm? That is not truth. Those are just lies out there on social media." Governor Hochul Attends Services at Abyssinian Baptist Church in Harlem (Sept. 12, 2021), https://governor.ny.gov/news/video-audio- photos-rush-transcript-governor-hochul-attends-servces- abyssinian-baptist-church.

The day before the mandate went into effect, Governor Hochul again expressed her view that religious objections to COVID–19 vaccines are theologically flawed: "All of you, yes, I know you're vaccinated, you're the smart ones, but you know there's people out there who aren't listening to God and what God wants. You know who they are." Governor Hochul Attends Service at Christian Cultural Center (Sept. 26, 2021), https://governor.ny.gov/news/rush- transcript-governor-hochul-attends-service-christian- cultural-center.

Around the same time, Governor Hochul also announced that New York would alter its unemployment insurance scheme. Healthcare workers who failed to comply with the mandate would not only lose their jobs; they would be *per se* ineligible for unemployment insurance benefits. See In Preparation for Monday Vaccination Deadline, Governor

Hochul Releases Comprehensive Plan to Address Preventable Health Care Staffing Shortage (Sept. 25, 2021), https://www.governor.ny.gov/news/preparation-monday-vaccination-deadline-governor-hochul-releases-comprehensive-plan-address. As the State's website explains, unemployment insurance cases are generally "reviewed on a case-by-case basis," but healthcare workers who refuse a vaccine are "ineligible." N. Y. State Dept. of Labor, Unemployment Insurance Top Frequently Asked Questions (Sept. 25, 2021), https://dol.ny.gov/unemployment-insurance-top-frequently-asked-questions.

### C

Facing the imminent loss of their jobs and unemployment benefits, the doctors and nurses before us filed two separate lawsuits seeking a preliminary injunction preventing New York from enforcing its new mandate against them. In the first suit, District Judge David Hurd granted the requested relief after concluding that New York's "intentional change in language is the kind of religious gerrymander" that violates the First Amendment. *Dr. A.* v. *Hochul*, 2021 WL 4734404, *8 (NDNY, Oct. 12, 2021) (internal quotation marks omitted). In the second suit, the District Court reached a contrary conclusion and denied relief without an opinion. *We The Patriots USA, Inc.* v. *Hochul*, No. 21–cv–4954 (EDNY, Sept. 12, 2021), App. to Application for Injunctive Relief in No. 21A125, p. 6. Ultimately, the Second Circuit issued a combined judgment rejecting all of the applicants' claims and dissolving the preliminary injunction issued in *Dr. A.* See *We The Patriots USA, Inc.* v. *Hochul*, 17 F. 4th 368 (CA2 2021) (*per curiam*).

### II

We assess requests for temporary injunctive relief under a familiar standard that focuses, among other things, on the merits of the applicants' underlying claims and the harms

they are likely to suffer. *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 2). In this case, no one seriously disputes that, absent relief, the applicants will suffer an irreparable injury. Not only does New York threaten to have them fired and strip them of unemployment benefits. This Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U. S. 347, 373 (1976). Accordingly, before us the parties' fight focuses dominantly on whether the applicants are likely to succeed on the merits of their First Amendment claim.

The answer to that question is clear. The Free Exercise Clause protects not only the right to hold unpopular religious beliefs inwardly and secretly. It protects the right to live out those beliefs publicly in "the performance of (or abstention from) physical acts." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990). Under this Court's precedents, laws targeting acts for disfavor only when they are religious in nature or because of their religious character are "doubtless . . . unconstitutional." *Id.*, at 877–878. As a result, where "official expressions of hostility to religion" accompany laws or policies burdening free exercise, we have simply "set aside" such policies without further inquiry. *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 18). But even where such overt animus is lacking, laws that impose burdens on religious exercises must still be both neutral toward religion and generally applicable or survive strict scrutiny. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993). To meet its burden under strict scrutiny, the government must demonstrate that its law is narrowly tailored to serve a compelling state interest. *Id.,* at 531–532. Applying these principles to this case, New York's mandate falters at each step.

A

Under the Free Exercise Clause, government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece*, 584 U. S., at ___–___ (slip op., at 17–18); see also *Smith*, 494 U. S., at 877–878. As a result, we have said that government actions burdening religious practice should be "set aside" if there is even "slight suspicion" that those actions "stem from animosity to religion or distrust of its practices." *Masterpiece*, 584 U. S., at ___–___ (slip op., at 17–18).

New York's mandate is such an action. The State began with a plan to exempt religious objectors from its vaccine mandate and only later changed course. Its regulatory impact statement offered no explanation for the about-face. At the same time, a new Governor whose assumption of office coincided with the change in policy admitted that the revised mandate "left off" a religious exemption "intentionally." The Governor offered an extraordinary explanation for the change too. She said that "God wants" people to be vaccinated—and that those who disagree are not listening to "organized religion" or "everybody from the Pope on down." Then the new Governor went on to announce changes to the State's unemployment scheme designed to single out for special disfavor healthcare workers who failed to comply with the revised mandate. This record gives rise to more than a "slight suspicion" that New York acted out of "animosity [toward] or distrust of" unorthodox religious beliefs and practices. *Id.,* at ___ (slip op., at 17). This record practically exudes suspicion of those who hold unpopular religious beliefs. That alone is sufficient to render the mandate unconstitutional as applied to these applicants.

B

New York's regulation fares no better if the question is the law's neutrality and general applicability.

Begin with neutrality. Even absent proof of animus, a

law will not qualify as neutral if a religious exercise is the
"object" of a law and not just "incidental[ly]" or unintention-
ally affected by it. *Smith*, 494 U. S., at 878. At "minimum,"
that means a law must not "discriminate on its face."
*Lukumi*, 508 U. S., at 533. Apart from that, it also means
that a law will not qualify as neutral if it is "specifically di-
rected at . . . religious practice." *Smith*, 494 U. S., at 878;
see also *Lukumi*, 508 U. S., at 535. For reasons we have
already seen, New York's mandate fails this test too. Ra-
ther than burden a religious exercise incidentally or unin-
tentionally, by the Governor's own admission the State "in-
tentionally" targeted for disfavor those whose religious
beliefs fail to accord with the teachings of "any organized
religion" and "everybody from the Pope on down." Even if
one were to read the State's actions as something other
than signs of animus, they leave little doubt that the re-
vised mandate was specifically directed at the applicants'
unorthodox religious beliefs and practices.

Consider general applicability next. Recently, a majority
of this Court reiterated that a law loses its claim to general
applicability when it "prohibits religious conduct while per-
mitting secular conduct that undermines the government's
asserted interests in a similar way." *Fulton* v. *Philadel-
phia*, 593 U. S. ___, ___ (2021) (slip op., at 6). That is ex-
actly what New York's regulation does: It prohibits exemp-
tions for religious reasons while permitting exemptions for
medical reasons. And, as the applicants point out, allowing
a healthcare worker to remain unvaccinated undermines
the State's asserted public health goals equally whether
that worker happens to remain unvaccinated for religious
reasons or medical ones. See *Does* v. *Mills*, 595 U. S. ___
(2021) (GORSUCH, J., dissenting from denial of application
for injunctive relief ).

To be sure, the State speculates that a religious exemp-
tion could undermine the purpose of its vaccine mandate
differently from a medical exemption if *more people* were to

seek a religious exemption than a medical exemption. But this Court's general applicability test doesn't turn on that kind of numbers game. At this point in the proceedings, the only question is whether the challenged law contains an exemption for a secular objector that "undermines the government's asserted interests in a similar way" an exemption for a religious objector might. *Fulton*, 593 U. S., at ___ (slip op., at 6). Laws operate on individuals; rights belong to individuals. And the relevant question here involves a one-to-one comparison between the individual seeking a religious exemption and one benefiting from a secular exemption. See, *e.g.*, *Tandon* v. *Newsom*, 593 U. S. ___, ___ (2021) (*per curiam*) (slip op., at 1) (comparing the relevant secular exemptions to "the religious exercise at issue").

If the estimated number of those who might seek different exemptions is relevant, it comes only later in the proceedings when we turn to the application of strict scrutiny. See *Holt* v. *Hobbs*, 574 U. S. 352, 368 (2015) (considering sizes of different groups seeking exemptions). At that stage, a State might argue, for example, that it has a compelling interest in achieving herd immunity against certain diseases in a population. It might further contend the most narrowly tailored means to achieve that interest is to restrict vaccine exemptions to a particular number divided in a nondiscriminatory manner between medical and religious objectors. With sufficient evidence to support claims like these, the State might prevail. See *infra*, at 10–11. But none of that bears on the preliminary question whether such a mandate is generally applicable or whether it treats a religious person less favorably than a secular counterpart.

C

Failing either the neutrality or general applicability test is enough to trigger strict scrutiny and impose on New York the burden of showing that its law serves a compelling interest and employs the least restrictive means of doing so.

*Lukumi*, 508 U. S., at 531.  And even accepting for present
purposes that the State can meet the first of these burdens,
it cannot satisfy the second.  Cf. *Mills*, 595 U. S., at ___–___
(opinion of GORSUCH, J.) (slip op., at 6–8).

Maybe the most telling evidence that New York's policy
isn't narrowly tailored lies in how unique it is.  It seems
that nearly every other State has found that it can satisfy
its COVID–19 public health goals without coercing reli-
gious objectors to accept a vaccine.  See Addendum to Ap-
plication for Injunctive Relief.  Nor has New York "offer[ed]
persuasive reasons" why it, almost uniquely, cannot do the
same.  *Holt*, 574 U. S., at 369.  To the contrary, as we have
seen, what explanations the Governor has chosen to supply
undermine rather than advance the State's case.

Though this alone is sufficient to show that New York's
law is not narrowly tailored, still more proof exists.  In a
similar case, Maine recently argued that it needed a 90%
vaccination rate among workers in each of its healthcare
facilities to protect against an undue number of COVID–19
breakout cases.  *Mills*, 595 U. S., at ___ (opinion of
GORSUCH, J.) (slip op., at 7).  By contrast, in the case before
us, New York has not even attempted to identify what per-
centage of vaccinated workers it thinks is necessary to pro-
tect public health.  And even assuming New York could
prove it needed to achieve a similar vaccination rate, the
evidence before us shows that employee vaccination rates
in the State's healthcare facilities already stand at between
roughly 90% and 96%.  Brief in Opposition to Application
for Injunctive Relief 14.  Putting a finer point on it:  New
York has presented nothing to suggest that accommodating
the religious objectors before us would make a meaningful
difference to the protection of public health.  The State has
not even tried.

Before leaving the subject, one further point bears men-
tion.  As I alluded to earlier, if a State could prove that
granting or denying religious exemptions *would* make the

difference between achieving a crucial vaccination threshold, it may be that denying exemptions beyond that threshold number could qualify as a narrowly tailored rule necessary to achieve a compelling state interest. Again, though, the problem is that New York does not even seek to advance an argument along these or any similar lines.

### III

Today, we do not just fail the applicants. We fail ourselves. It is among our Nation's proudest boasts that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in [matters of] religion." *West Virginia State Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943). In this country, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit . . . protection." *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 714 (1981). Nor is the free exercise of religion "limited to beliefs which are shared by all of the members of a religious sect." *Id.*, at 715–716. Millions have fled to this country to escape persecution for their unpopular or unorthodox religious beliefs, attracted by America's promise that "[e]very citizen here is in his own country. To the protestant it is a protestant country; to the catholic, a catholic country; and the jew, if he pleases, may establish in it his New Jerusalem." *People* v. *Phillips*, 1 W. L. J. 109, 112–113 (Gen. Sess., N. Y. 1813), reported in W. Sampson, The Catholic Question in America 85 (1813).

As today's case shows, however, sometimes our promises outrun our actions. Sometimes dissenting religious beliefs can seem strange and bewildering. In times of crisis, this puzzlement can evolve into fear and anger. It seems Governor Hochul's thinking has followed this trajectory, and I suspect she is far from alone. After all, today a large majority of Americans—religious persons included—have taken one of the COVID–19 vaccines. It is also true that

some faith leaders, the Pope included, have encouraged vac-
cination.  If so many other religious persons are willing to
be vaccinated, it is tempting enough to ask:  What can be so
wrong with coercing the few who are not?

By now, though, we should know the costs that come
when this Court stands silent as majorities invade the con-
stitutional rights of the unpopular and unorthodox.  More
than 80 years ago, in the shadow of a looming second world
war, local governments across the country rushed to en-
courage displays of national unity.  A public school in Min-
ersville, Pennsylvania, did its part by requiring all students
to stand daily and salute the American flag.  But Lillian
and William Gobitas would not oblige.  As Jehovah's Wit-
nesses, they believed they could not pledge fealty to any-
thing or anyone except God.  When the children refused to
salute, the school expelled them.  See S. Peters, Judging Je-
hovah's Witnesses: Religious Persecution and the Dawn of
the Rights Revolution 19–38 (2000) (Peters).

When the Gobitas family sought this Court's interven-
tion, it demurred.  The Court ruled that the Constitution
does not "compel exemption from doing what society thinks
necessary for the promotion of some great common end."
*Minersville School Dist.* v. *Gobitis*, 310 U. S. 586, 593
(1940).  In doing so, the Court not only erred in the small
matter of the children's last name; it erred in the most fun-
damental of things.  It took the view that the collective was
more important than the individual—and that the demands
of an impending emergency were more pressing than hold-
ing fast to the timeless promises of our Constitution.  *Id.,* at
596.  In the weeks that followed the decision, Witnesses
across the country suffered hundreds of physical attacks.
Peters 72–95.

Eventually, the Court changed course and overruled *Go-
bitis*.  In *West Virginia State Bd. of Ed.* v. *Barnette*, the
Court finally acknowledged what had been true all along—

that our Constitution is intended to prevail over the passions of the moment, and that the unalienable rights recorded in its text are not matters to "be submitted to vote; they depend on the outcome of no elections." 319 U. S., at 638. Instead, it is this Court's duty to "apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.*, at 641. The First Amendment protects against "coercive elimination of dissent" and "was designed to avoid these ends by avoiding these beginnings." *Ibid.*

Today, our Nation faces not a world war but a pandemic. Like wars, though, pandemics often produce demanding new social rules aimed at protecting collective interests— and with those rules can come fear and anger at individuals unable to conform for religious reasons. If cases like *Gobitis* bear any good, it is in their cautionary tale. They remind us that, in the end, it is always the failure to defend the Constitution's promises that leads to this Court's greatest regrets. They remind us, too, that in America, freedom to differ is not supposed to be "limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *Barnette*, 319 U. S., at 642. The test of this Court's substance lies in its willingness to defend more than the shadow of freedom in the trying times, not just the easy ones.

We have already lived through the *Gobitis-Barnette* cycle once in this pandemic. At first, this Court permitted States to shutter houses of worship while allowing casinos, movie theaters, and other favored businesses to remain open. Falling prey once more to the "judicial impulse to stay out of the way in times of crisis," the Court allowed States to do all this even when religious institutions agreed to follow the same occupancy limits and protective measures considered safe enough for comparable gatherings in secular spaces.

*Roman Catholic Diocese*, 592 U. S., at ___ (GORSUCH, J., concurring) (slip op., at 5).  But as days gave way to weeks and weeks to months, this Court came to recognize that the Constitution is not to be put away in challenging times, and we stopped tolerating discrimination against religious exercises.  *Tandon*, 593 U. S., at ___ (slip op., at 1).  Finally, churches and synagogues and mosques reopened on equal footing with secular institutions.

Still, it seems the old lessons are hard ones.  Six weeks ago, this Court refused relief in a case involving Maine's healthcare workers.  *Mills*, 595 U. S. ___.  Today, the Court repeats the mistake by turning away New York's doctors and nurses.  We do all this even though the State's executive decree clearly interferes with the free exercise of religion—and does so seemingly based on nothing more than fear and anger at those who harbor unpopular religious beliefs.  We allow the State to insist on the dismissal of thousands of medical workers—the very same individuals New York has depended on and praised for their service on the pandemic's front lines over the last 21 months.  To add insult to injury, we allow the State to deny these individuals unemployment benefits too.  One can only hope today's ruling will not be the final chapter in this grim story.  Cases like this one may serve as cautionary tales for those who follow.  But how many more reminders do we need that "the Constitution is not to be obeyed or disobeyed as the circumstances of a particular crisis . . . may suggest"?  *Downes* v. *Bidwell*, 182 U. S. 244, 384 (1901) (Harlan, J., dissenting).